**In re TAMARACK TRAIL COMPANY, f/d/b/a Diem & Gilmore Company f/d/b/a Bruce Diem and Doug Gilmore, Debtor.**

**Bankruptcy No. 1–81–00526.**

United States Bankruptcy Court, S. D. Ohio, W. D.

April 29, 1982.

Paul Nemann, David H. Todd, Cohen, Todd, Kite & Stanford, Cincinnati, Ohio, for Gary R. Kilday.

**4**

R. Edward Tepe, Benjamin, Faulkner, Tepe & Sachk, Cincinnati, Ohio, for debtor.

## DECISION ON CONFIRMATION

BURTON PERLMAN, Bankruptcy Judge.

Debtor in this Chapter 11 case is a corporation engaged in the business of developing land and building condominiums on it for resale. The stock in the corporate debtor is owned fifty percent each by Messrs. Gilmore and Diem. A disclosure statement was filed on behalf of debtor and one was also filed on behalf of a creditor, Kilday. Both were approved by the court, and separate and competing plans were submitted to creditors by debtors and by Kilday together with the respective disclosure statements. The matter came on for hearing on confirmation. It was then determined that the outcome of balloting by creditors was that neither plan was completely accepted by all classes. The vote against debtor's plan decisively rejected it.

As to the Kilday plan, a mortgagee of certain real estate, Dreyfus, comprising Class 7, rejected the plan, as did the equity security holders Gilmore and Diem, constituting Class 11. At the request of creditor Kilday we continued the confirmation hearing for consideration of confirmation pursuant to 11 U.S.C. § 1129(b) notwithstanding these rejections. At the time of the continued hearing we were informed that Dreyfus had withdrawn its rejection. That left to be dealt with only the question of whether the plan of Kilday could be confirmed despite the objection of Class 11 equity security holders. Hearing on this issue proceeded. Testimony on behalf of Kilday and of the opposing equity security holders was taken. Certain changes not here relevant have in the interim been approved, and the subject now before us is Kilday Second Amended Plan. The following reflects our findings of fact and conclusions of law based upon the evidence elicited at the hearing.

Debtor began business in August 19, 1978 having for its purpose the developing and building of a condominium project. In fur-therance of this object, debtor acquired a tract of land in Union Township, Clermont County, Ohio comprising approximately 49 acres. It proceeded to develop a portion of the tract consisting of 6.074 acres. The remainder of the tract, which has always been and is today in an undeveloped state, consists of 42.391 acres. Debtor planned to erect eleven (11) buildings, each containing six condominium units on the six acre tract. At the present time the eleven buildings are in various stages of construction, ranging from completed to not even begun. The eleven buildings are identified by number on a plat introduced into evidence at the hearing, Kilday Exhibit 1. Three of the buildings, buildings 1, 4, and 5, are not even begun, though the ground has been prepared for the commencement of construction. Water and sewer lines if not in place at the immediate site of each of these three locations, are sufficiently close that extending such lines to the location would require minimal effort and expense. Buildings 2 and 3 are under construction, with some dry wall in place. These buildings are approximately 70% complete. Building 6 is complet with the exception that one unit requires carpeting. Building 7 is framed with some dry wall in place and is 40% complete. Buildings 8 and 9 are complete. Building 10 is complete to the point that one unit is occupied, and is 90% complete. Building 11 is complete with three units occupied, there otherwise being serious fire damage in the building which requires some corrective work. Conflicting evidence was presented as to the cost of carrying out that corrective work.

Building 9 has already been sold by debtor in its entirety. Two units in building 6 have been sold. Five units in building 8 have been rented.

The construction lender for buildings 2 and 3 was Central Savings, while the lender for the remaining buildings was Eagle Savings.

■ The task presented to us against this background is the valuation of the land and buildings, for valuation will determine the

outcome of the objection to confirmation on the part of Class 11. That is, the Kilday plan before us provides for the cancellation of the stock of objecting equity security holders Gilmore and Diem. It would be inequitable to confirm the plan with such a provision if this were to deprive these equity security holders of a valuable asset without compensation. If there were to be a remaining equity after creditors were dealt with as proposed in the plan, this would be the situation and we would be unable to confirm the plan. If, on the other hand, there were no remaining equity, and the stock was valueless, then it would not violate concepts of equity for the plan to be confirmed as it stands. That such an outcome was contemplated by the Congress in enacting 11 U.S.C. § 1129(b)(2)(C) is clear from the following:

> "... If the interests are 'under water' then they will be valueless and the plan may be confirmed notwithstanding the dissent of that class of interests even if the plan provides that the holders of such interests will not receive any property on account of such interests.
>
> Alternatively, under clause (ii), the court must confirm the plan notwithstanding the dissent of a class of interests if the plan provides that holders of any interests junior to the dissenting class of interests will not receive or retain any property on account of such junior interests. Clearly, if there are no junior interests junior to the class of dissenting interests, then the condition of clause (ii) is satisfied. The safeguards that no claim or interest receive more than 100 percent of the allowed amount of such claim or interest and that no class be discriminated against unfairly will insure that the plan is fair and equitable with respect to the dissenting class of interests." 124 Cong.Rec. H 11,103 (Sept. 28, 1978); S 17,420 (Oct. 6, 1978).

See also *In re Muskegon Motor Specialties,* 366 F.2d 522, 525 (6th Cir., 1966).

The determination of whether or not there is a remaining equity is assisted by the stipulation of the parties that the total claims against the debtor amount to $2,165,-000.00. Whether the stock has value will depend upon whether the value of debtor's assets exceeds or is below this amount.

■ As stated by Robert J. Herking, called as an expert appraiser by debtor, three appraisal techniques are available to appraisers in arriving at fair market value. The first is the market approach which depends upon evidence of comparable sales. The second is the cost approach which is based upon the actual costs of construction and other costs. The third is the capitalization of income approach. Authorities support this statement. See *Thompson on Real Property,* vol. 5A, sec. 2582, 1981 Supp. p. 25. We agree with the suggestion of Herking that the capitalization of income approach would be inappropriate in this case because we are not dealing with income producing property.

1. The Six Acres. This is the portion of the entire tract where debtor has developed the land and erected buildings to the extent above described. Each building comprises or is to comprise six (6) condominium units. It is reasonable to value a building based upon the fair market value of the condominium units therein. Fair market value is agreed by the parties to mean the price a willing buyer would pay to a willing buyer in a non-forced sale. We accept this standard. See *Thompson on Real Property.* vol. 5A, p. 206.

■ A fundamental question must initially be resolved in this connection. Debtor and its expert appraiser suggests that the valuation of a unit should be on the basis of a completed condominium project, which means with all amenities in place. (The term amenities was used by the experts in this case to refer to clubhouse, swimming pool, tennis courts, etc.) In fact, the project was not at a stage where these were in place. Indeed, parking surfaces and landscaping had not been completed in the project. Kilday on the other hand, asserts that the value of a building must be taken as it stands today, with the project in its present state of development. We believe that the law requires us to value the

**6**

project as it stands today. See *Matter of Pine Gate Associates, Ltd.,* 3 Bankr.Ct.Dec. 301, 305 (B.J.N.D.Ga., 1977).

Harry Oelerich, Kilday's expert appraiser, based his valuation of each building upon the number of square feet therein multiplied by $32.50, which he testified was an appropriate replacement cost derived from the Dow Building Costs Index. Since he testified that there were 6,880 square feet in a completed building, his valuation for a completed building was $223,600.00. Thus, Kilday's expert used a cost approach in his appraisal.

Oelerich testified further that buildings 6 and 8 were complete. (Except that one unit in building 6 required carpeting.) He testified that building 11 was complete except that there had been fire damage in the building which he estimated would cost $50,000.00 to cure. He testified further that buildings 2 and 3 were 70% complete; that building 7 was 40% complete; and that building 10 was 90% complete. Applying these percentages to his appraisal of the value of a complete building, he arrived at a valuation of all structures in the six acre tract at $1,149,984.00. To arrive at a value for the six acre tract, he added to this figure his appraisal of the value of land ($10,000.00 per acre) and the costs of development ($3,000.00 per unit for each of the 40 unsold units.) His total valuation of the six acres was $1,330,000.00.

Herking, debtor's appraiser, did not arrive at a separate valuation for the six acres. He did testify, however, to different appraisals of fundamental components used by Oelerich in his computation. Herking instead of using a cost approach used a market approach, i.e. evidence of comparable sales. On this basis, he arrived at a value of a unit between $45,000.00 and $47,-000.00 for a finished unit. Using a mean value of $46,000.00 per unit, this would give a six (6) unit building a value of $276,-000.00. Herking like Oelerich recognized that valuation of the eight (8) buildings as they stand requires a deduction because of the incompleteness of some of the buildings, and for this purpose he used a figure given to him by Gilmore of $180,000.00. He made no independent determination of this figure. Herking's value for the six acres, had he calculated one, would have been $1,752,-000.00.

After serious consideration, we have come to the conclusion that we cannot accept the appraisal of either of these experts for a valuation of the six acres. We believe that the market approach is the sounder appraisal technique, for it is more closely related to the realities of the given situation than a theoretical cost of construction. We would only consider using a cost basis in the present situation if no reasonable information as to comparable sales existed. We cannot, however, accept the comparable sales relied upon by Herking. These were in other projects more or less remote from the one at hand, and were in projects which had been completed with all amenities in place.

The evidence does contain comparable sales which we deem relevant and upon which the valuation should be based. In debtor's case itself there was testimony about the sale price of units sold in the very project with which we are dealing. These were said to range between $41,000.00 and $43,000.00. (There was also testimony that two units had been sold for $33,000.00, but apparently this was because of special considerations.) Using an average value of $42,000.00 per unit, we hold that the fair market value of a complete building is $252,000.00. This is the value of building 8. It should be rounded off to $250,000.00 for building 6 on account of the missing carpet. As to building 11 which required the curing of fire damage, we accept the estimate of Oelerich that $50,000.00 should be allowed for this purpose. The value of building 11 then is $202,000.00.

Gilmore in his testimony agreed with the estimate of Oelerich as to the degree of completeness of the four incomplete buildings, buildings 2, 3, 7 and 10. Applying those percentages we arrive at a value of $680,400.00 for the four incomplete buildings, and a total of $1,384,400.00 for the value of buildings on the six acres.

This approach makes it unnecessary for us to resolve the conflict in the evidence as to the correct cost of construction on a square foot basis. Further, we observe that this approach finds support in the testimony of Richard Hoffman that it would cost $158,368.00 to complete buildings 2 and 3, for there is a rough correspondance to that figure and the figures which we have employed.

In addition to the structures in the six acre tract, there were three sites prepared for buildings 1, 4 and 5 which have not been begun. Oelerich assigned a value of $3,000.00 per unit, or $18,000.00 per building, for each of these sites. He said that had they been finished developed lots, that is complete with respect to utilities, landscaping, parking, grading, he would have used a value of $4,500.00 to $5,000.00 per unit. Herking, on the other hand, using comparable sales, arrived at a figure of $6,000.00 per unit. We accept Oelerich's valuation, for the reason stated above, that the correct valuation is based upon the project as it stands today, not as it might be in a completed project. This latter basis was employed by Herking.

Thus we add $54,000.00 (3 × $18,000.00) to arrive at a valuation of $1,438,400.00 for the six acre tract.

2. The Forty-two Acres. It was undisputed that when debtor purchased the land for its condominium project in 1978, it paid $10,000.00 per acre. Because this land remains in its original condition, Oelerich on behalf of Kilday was of the opinion that $10,000.00 per acre continues to be a valid valuation. He pointed out that certain areas in the tract are unavailable for building. Debtor attacked purchase price as a valuation basis, arguing that the land was rezoned after acquisition by debtor. While there are suggestions of rezoning in the record, there is nothing in the record as to what the rezoning was, or that it was of a nature to increase the value of the land.

In addition to evidence of the actual purchase price of this acreage, Oelerich agreed that a value of land for each unit to be built was a valid approach to valuation. He valued each unit in its present state at $1500.00. There was no dispute that 282 additional units were projected for the forty two acres. On this basis Oelerich appraised the forty two acres at $423,000.00.

For debtor, Herking testified that he would arrive at a valuation of $705,000.00 for the 42 acres. His basis was that 282 units were projected and he applied a figure of $2,500.00 per unit on account of land. We cannot accept this appraisal because the $2,500.00 is for developed land. As we said earlier, the project must be valued in its present state.

The only other testimony regarding valuation of the undeveloped 42 acres was with reference to a sale of a four (4) acre tract in an adjoining condominium development. Gilmore testified that this tract sold for $160,000.00, 35 units thereon being approved, so that the cost per unit for raw land figures out to be $4,400.00. We reject the evidence of this sale as applicable here because it was in a completed condominium development with all amenities in place.

We conclude, therefore, either on a density basis or on an acreage valuation, that the fair market value of the forty-two undeveloped acres is (rounded) $424,000.00.

\* \* \* \* \* \*

We therefore conclude that the fair market value of the entire 49 acre tract in its present state of development with those structures presently existing on it, totals $1,862,400.00. To this must be added assets of debtor consisting of $54,000.00 for an insurance settlement and $30,000.00 on deposit at Central Savings representing the balance of a construction loan. The total value of assets of debtor therefore amounts to $1,946,400.00. The debts of debtor exceed its assets, and the issue with which we are here presented is resolved in favor of Kilday. The Kilday Second Amended Plan will be confirmed.