**In the Matter of SAVANNAH GARDENS–OAKTREE a Georgia Limited Partnership, Debtor.**

**Bankruptcy No. 90–41038.**

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

June 10, 1992.

### MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Chief Judge.

This matter is before the Court in accordance with this Court's Order dated February 1, 1991, requiring a valuation of assets. On January 18, 1991, the Debtor filed its first Disclosure Statement and Plan of Reorganization. Attached to the Disclosure Statement, as Exhibit "A", was an appraisal of the partnership's principal asset, the Savannah–Gardens Apartments (hereinafter referred to as the "Apartments"). The appraisal, dated May 23, 1990, was prepared by Schultz, Carr, Bissette and Atwater. It reported an "as is" market value of the Apartments as of the such date of $7,000,000.00 and projected a stabilized market value of $7,850,000.00 upon completion of renovations.

This Court's Order dated February 1, 1991, required parties in interest holding secured claims collateralized by such property to file objections to the Disclosure Statement by March 8, 1991, or the valuation attached as Exhibit "A" to the Disclosure Statement would be accepted by the Court as binding on all parties.

On March 7, 1991, the Federal Home Loan Mortgage Corporation (hereinafter "FHLMC") filed an objection to this Disclosure Statement, contending that the Apartments had a fair market value of only $5,850,000.00.

The matter came before the Court on May 2, 1991. Prior to the hearing, the partnership filed an amended Disclosure Statement and Plan of Reorganization. The amendments, however, proposed no change in Exhibit "A" to the Disclosure Statement and did not amend the partnership's contentions concerning the value of the Apartments.

At the conclusion of the hearing, the parties requested that this Court take the matter under advisement and issue no opinion due to the parties' attempt to reach a negotiated settlement. The Court there-

fore directed that the parties file briefs by August 15, 1991, and the matter was held under consideration by the Court pending a report from the parties concerning the success of negotiations.

In early May, 1992, the Court was notified by the parties that they had been unsuccessful in reaching a negotiated settlement and requested that this Court enter a ruling based upon the record and briefs in this matter. Accordingly, the following shall constitute this Court's Findings of Fact and Conclusions of Law in accordance with Bankruptcy Rule 7052.

The Plan proposed by the partnership, as amended, provides for the payment of all claims in full in deferred cash payments over the term of the Plan. Accordingly, the purpose to be served by valuing the Apartments as it relates to the pending Plan, is not to assess whether the Plan satisfies the "best interests of creditors test" for purposes of "cramdown" under 11 U.S.C. Section 1129(b). Rather, the legal purpose to be served is to determine the amount of FHLMC's "secured claim" under 11 U.S.C. Section 506 and to determine whether the value of the Apartments will serve to adequately protect the secured claim of the FHLMC during the payout proposed by the Plan. The issue of valuation is also raised by FHLMC's Motion for Relief from the Automatic Stay which is being consolidated with this case.

## I. THE APPROPRIATE TIME AND STANDARD OF VALUATION

### A. *Time for Valuation of the FHLMC Claim*

This Court's Order, dated February 1, 1991, provides, in pertinent part:

AT THE ABOVE–NAMED TIME AND PLACE, the Court shall determine the secured status of all parties claiming liens on property of the estate and shall determine the value of such property pursuant to 11 U.S.C. Section 506 ...

The partnership filed the Voluntary Petition under Chapter 11 on June 4, 1990. As of June 4, 1990, the FHLMC held a secured claim, collateralized by the Apartments and by rents. As of May 2, 1991, the amount of the FHLMC claim was approximately $5,913,155.48 (Transcript, page 127).[1]

According to Collier on Bankruptcy, the value of the property should be determined as of the date to which the valuation relates. 3 *Collier on Bankruptcy*, ¶ 506.4 at 506–37 (15th Ed.1992). If the purpose of the valuation is to determine the amount of a secured claim for purposes of a Chapter 11 plan, the value should be determined as of, or close to, the effective date of the plan. *Id.*

The partnership contends that the Apartments had a current "as is" value of $7,000,000.00 as of the date of the filing of the bankruptcy petition. FHLMC contends, on the other hand, that the Apartments had an "as is" market value of $5,890,000.00 as of the filing date. There is no contention by any party that the Apartments have diminished in value since the date of the filing. FHLMC contends that, as of May 2, 1991, the Apartments had increased in value to $5,900,000.00. Russell Martin, testifying as owner of the Apartments, stated that the value of the Apartments had not decreased between June 4, 1990, and May 2, 1991, and had at least maintained the $7,000,000.00 value determined as of the filing date.

At the hearing on May 2, 1991, the partnership presented the testimony of Mr. Carl Schultz of the appraisal firm of Schultz, Carr, Bissette and Atwater. Mr. Schultz's appraisal was dated May 23, 1990. The FHLMC presented an appraisal prepared by Mr. Michael Easterwood on May 25, 1990. Mr. Easterwood updated his appraisal as of March 20, 1991.

Both the appraiser for the partnership and the appraiser for FHLMC agreed that the value of the Apartments will increase once the Apartments are "stabilized." The

---

1. The claims includes post-petition interest and late charges. The partnership believes that the amount is approximately correct as of May 2, 1991, but has reserved the right to object to the amount of the claim. The amount in dispute is not believed to be material as it relates to the issue of valuation.

partnership's appraiser testified that once "stabilized" the value of the Apartments should increase to $7,850,000.00. Although FHLMC's appraiser testified that he did not render an opinion as to the "stabilized value" of the Apartments, his appraisal shows that he did, in fact, reach a conclusion that the Apartments would have a "reversion value" after five years of $7,250,911.00. By May 2, 1991, the FHLMC appraiser determined that the "reversion" value, after five years, had increased to $7,390,423.00. Therefore, both appraisers agree that the value of the Apartments will continue to increase, provided renovations continue.

The question before the Court, then, is what was the value of the property collateralizing the secured claim of FHLMC. If the claim was fully secured, FHLMC will be entitled under 11 U.S.C. Section 506 to interest, actual costs of collection and reasonable attorneys' fees as a component of its allowed secured claim. If the claim is undersecured, as contended by FHLMC, the claim may not be augmented by interest, costs or reasonable attorneys' fees. The valuation is material to the plan because the plan proposes a temporary "negative amortization" of the FHLMC claim. If such "negative amortization" is not ultimately consented to, a determination will have to be made whether the value of the property will continue to provide "adequate protection" during the period the FHLMC claim will be increased due to the "negative amortization."

## B. *The Standard of Valuation*

■ Although each appraisal purports to yield the "fair market value" of the Apartments, a closer analysis will show that, while the partnership's appraiser's "fair market value" assumes continuing operations, the FHLMC's appraisal assumes an immediate sale. 11 U.S.C. Section 506(a) provides, in pertinent part:

Such value shall be determined in light of the purpose of the valuation and of the proposed disposition *or use* of such property, and in connection with any hearing on such disposition *or use* or *on a plan*

*affecting such creditor's interest.* (Emphasis added)

Prior to the enactment of the Bankruptcy Code, it was well established that property should be valued considering the "most commercially reasonable disposition practicable in the circumstances."

Where collateral is used or produced under Chapter XI by a going business which offers reasonable prospects that it can continue, the value of the collateral is equatable with the net recovery realizable from its disposition as near as may be in the ordinary course of the business.

*In re Shockley Forest Industries, Inc.*, 5 B.R. 160, 162 (N.D.Ga.1980) (*quoting In re American Kitchen Foods, Inc.*, 9 CBC 537, 553 (D.Me.1976).) In *Shockley Forest Industries, Inc.*, Judge Robinson held that, in the context of reorganization with prospects for success, the fair market value is the appropriate standard of valuation. *Id.* at 162.

According to *Collier on Bankruptcy:*

When the subject property is to be used and retained by the debtor, application of section 506(a) requires that the value of such property be determined in light of such use. The proposed use will, of course, depend upon the circumstances, but will generally be a use for which the property is intended or designed (and for which it was originally acquired by the debtor). Therefore, in order to give effect to the purpose of the valuation as required by section 506(a), the court must determine the value of the subject property in a manner and upon a basis consistent with such use and with the protection or compensation to be afforded. To illustrate, if the valuation is to be made in a Chapter 11 case in the context of providing adequate protection with respect to a decrease in the value of the subject property resulting from its continued retention and use by the debtor, and if the court finds that the prospects of successful reorganization are good, the court may find that the appropriate value under the circumstances is the value of such property to the debtor assuming interrupted continuation of such re-

tention and use. Such a value of the subject property might be characterized as its replacement value to the debtor, fair market value, its going concern value or, if a successful reorganization appears clearly assured, a value which takes into consideration not only the tangible value of the property but also the earnings to be derived therefrom. 3 *Collier on Bankruptcy,* ¶ 506.04 at 506–27–28 (15th Ed.1992) (Citations omitted).

Here, the partnership has proposed a plan which provides for its continued operation of the Apartments. The claim of the FHLMC is designated to be paid in full, out of future operations along with 100% of the allowed, unsecured claims. The partnership will retain its interest. There is a high probability that the pending plan will be modified based upon negotiations, however, it is not anticipated that these basic provisions will change. Accordingly, the most appropriate standard evaluation to use in this case is the "going concern" or "fair market value" standard. *See In re Beacon Hill Apartments, Ltd.,* 118 B.R. 148 (N.D.Ga.1990).

## II. DETERMINATION OF MARKET VALUE BY CAPITALIZATION OF THE NET OPERATING INCOME

■ The most striking dissimilarities between the two appraisals is not in the calculation of net operating income ("N.O.I.") but rather with its subsequent use to determine market value based upon an income approach. Mr. Schultz, Debtor's appraiser, analyzed ten actual sales of apartment complexes in the Savannah, Georgia, area to determine the actual capitalization rates, as reflected by those market events. From that analysis, Mr. Schultz determined that the rates of capitalization from the comparable sales ranged between 6.5% and 12.17%. In other words, the N.O.I. for each sale ranged between 6.5% and 12.17% of the purchase price of each complex.

Mr. Schultz also calculated the capitalization rate based on the mortgage/equity method. This yielded a capitalization rate of 11.99%. Based on the market and mortgage/equity method, Mr. Schultz determined that a capitalization rate of between 11.75% and 12% of stabilized value was appropriate. This analysis produced a final income approach value of $7,850,000.00 as stabilized.

Schultz then reduced the income approach stabilized value to the "as is" value by deducting the estimated costs to complete and rent loss during the rent-up period. Schultz also used a discounted cash flow analysis over a 5–year projection period. This adjustment required a total reduction of approximately $850,000.00 and indicated a current value of $7,000,000.00.

The FHLMC appraiser, Mr. Easterwood, used a capitalization rate of 15.82%. This FHLMC appraiser failed to make an analysis of market capitalization rates for similar complexes in the Savannah, Georgia, area. Rather, he divided his N.O.I. of $918,578.00 by the "as is" value which he previously reached as a result of his market value analysis to yield an overall rate of 15.82%. In the update, Easterwood used the same format to determine the capitalization rate, again failing to make a comparable market analysis. Accordingly, Easterwood's approach will always result in his "income" valuation of the property equalling his "market value" analysis because the capitalization rate is a derived figure resulting from the division of the N.O.I. by his predetermined market value of the subject property. When that capitalization rate is then divided into the N.O.I. to yield market value it automatically yields the same figure as the one used to obtain the capitalization rate. Therefore, Easterwood's income approach is meaningless. Therefore, an analysis of the Market Approaches to value of the two appraisers must be made.

## III. MARKET APPROACH TO VALUE

Both appraisers determined the market value of the Apartments by: (1) A gross rent multiple analysis; and (2) by a value per apartment unit analysis. Additionally, Mr. Schultz also made a determination of market value by a price per square foot formula. In the market approach category, the results of the two appraisals varied widely. The partnership's appraiser placed

a stabilized value on the Apartments of $8,000,000.00 using the market approach, while the FHLMC found an "as is" value of $5,890,000.00. Each appraiser examined sales which the appraiser deemed to be "comparable" in order to reach their respective conclusions. Accordingly, an analysis of each appraiser's selected comparable sales must be made.

The partnership's appraiser selected 10 apartment sales in the Savannah, Georgia, area to determine comparable sales. Each of the sales selected by Mr. Schultz was an arms length market sale. Mr. Schultz summarized these sales on page 40 of his report as follows:

| Sale Number | Sale Date | Number of Units | Year Built | Price by Gross Income Multiple | Price per Square Foot | Price per Unit |
|---|---|---|---|---|---|---|
| 1 | 01–90 | 4 | 1970 | 4.52 | $16.94 | 12,471 |
| 2 | 01–90 | 8 | 1970 | 4.75 | $17.34 | 13,111 |
| 3 | 04–89 | 8 | 1976 | 4.70 | $19.92 | 15,539 |
| 4 | 10–87 | 12 | 1926 | N/A | $20.94 * | 15,833 * |
| 5 | 03–87 | 232 | 1969 | 4.80 | $20.51 | 21,767 |
| 6 | 09–88 | 58 | 1969 | 6.57 | $41.77 | 29,311 |
| 7 | 07–88 | 128 | 1979 | 6.46 | $34.79 | 35,563 |
| 8 | 05–89 | 8 | 1974 | 8.47 | $37.99 | 31,230 |
| 9 | 07–89 | 4 | 1955 | 8.26 | $25.55 | 31,250 |
| 10 | 02–89 | 16 | 1986 | 6.43 | $32.10 | 32,812 |

* Unrenovated

---

Mr. Schultz determined that sales 1 and 2 were the most comparable to the Apartments. He noted that they were, however, very small developments when compared to the subject property and have larger units. Adjusting this data accordingly Mr. Schultz projected the stabilized value of the Apartments as follows:

735 Units @ $10,750 per unit = $7,901,250
565,209 square feet @ $14.00 per square foot = $7,787,000
$1,920,000 (gross income) × 4.25 (reasonable gross income multiplier) = $8,160,000
Correlated at $8,000,000

Mr. Schultz then reduced the "stabilized" value to "as is" value through an analysis of the cost to renovate the units plus the rent loss during the renovation period to reach an "as is" value of $7,000,000.00.

The market approach of the FHLMC's appraiser, Mr. Easterwood, is defective. Mr. Easterwood selected five sales which he considered to be comparable. Out of these five sales, three were located in the metropolitan Atlanta area. Each of the three Atlanta sales were foreclosure sales or were resales by a lender following foreclosure. These three sales are not comparable to the subject property. Mr. Easterwood admitted, under cross-examination, that a foreclosure sale did not meet the criterion of a sale for "market value."

With respect to the remaining two sales selected by Mr. Easterwood, Sale Number "1" of the Country Crossing Apartments located in Port Wentworth, near Savannah, Georgia, produced a gross rent multiplier of 4.61 and a price per unit of $8,300.00. Easterwood's comparable Sale Number "2" was a December, 1989, sale of the Park Villas Apartments located about two miles southwest of the Apartments, on that sale, the actual gross income multiplier was 5.69. Mr. Easterwood forced the gross income multiplier down to 2.6 by "adjusting" the sales price downward from the actual sales price of $3,025,000.00 to $1,200,-000.00. Easterwood's only justification for the "adjustment" was due to his perception of favorable tax credits associated with the Park Villas. Mr. Easterwood's logic fails to justify the "adjustment." A tax credit available to such a project would serve to shelter *income*. Easterwood's logic is that

the purchase price for the Apartments was overstated because of this tax shelter available to the purchaser.[2] In other words, Easterwood contends the purchasers were willing to pay more than the fair market value of the property because certain income from the property would be sheltered from taxation. This theory fails in the face of the fact that Easterwood's appraisal shows that the property was encumbered with a $3,025,000.00 loan, bearing 9% interest. The willingness to assume this loan indicates a belief that the Apartments were worth at least the loan value.

The actual price per unit for the Park Villas sale was $20,166.67 ($3,025,000.00 Purchase Price) ÷ 150 (number of units). Easterwood again forces the price down to $8,000.00 per unit using his "adjusted" purchase price.

The FHLMC's appraiser determined that there had been no additional "comparable" sales between the date of his original appraisal and the update. Accordingly, his market value analysis is based entirely upon the original appraisal.

As noted above, based upon this "market analysis", Easterwood concluded that the most appropriate approach to market value was to multiply the stabilized Adjusted Gross Rental by the Gross Rent Multiplier determined from his analysis of the other sales. The gross rent multiplier selected by Mr. Easterwood was 2.75. This multiplier times the stabilized rental income of $1,244,580.00 equaled a market value of $5,897,575.00.

The difference in the selection of the Gross Rent Multiplier, then, accounts for one of the chief variances between the Schultz and Easterwood appraisals. As noted, Schultz's selected gross rent multiplier of 4.25 was based upon an analysis of ten apartment complex sales in the Savannah area and was the most conservative of all the multipliers observed. On the other hand, Easterwood's gross rent multiplier of

2.75 had no basis in fact. The two Savannah sales selected as comparable by Easterwood had sale prices which generated actual gross rent multipliers of 4.61 and 5.69, respectively. Even Easterwood admitted that the sale of the Apartments to the partnership in May, 1986, yielded a Gross Rent Multiplier of 3.89, which, multiplied by Easterwood's estimate of stabilized rental income of $2,144,580.00 would yield a value for the Apartments of $8,342,-416.20.[3]

Easterwood also values the Apartments on a per unit analysis, selecting $8,000.00 per unit as the most appropriate value. This analysis did not change in his update. Again, Easterwood significantly understates the actual market conditions. The purchase price paid by the partnership for the Apartments in 1986 was $6,300,000.00. That purchase price would yield a purchase price per unit of $8,571.00 ($6,300,000.00 ÷ 735 units). Easterwood's conclusion that the Apartments are worth less now than when purchased by the partnership in 1986 is not viable.

Schultz's analysis of the cost per unit of $10,750.00 was based upon the market analysis previously discussed which I find persuasive.

Based upon the evidence presented, the Court is persuaded that Mr. Schultz's appraisal presents the more accurate picture of the current value of the Apartments and the stabilized value of the Apartments. Accordingly, the Court finds that the Apartments have a current value of $7,000,000.00 and, when renovated, will increase in value to $7,850,000.00.

SO ORDERED.

---

**2.** Easterwood submits no proof that the tax credit, if it existed, survived the sale.

**3.** In his update, Easterwood increased the value yielded by his gross rent multiple analysis due

to his projected increase in the stabilized rental income. His analysis in his update yields a value of $6,031,344.00. However, the gross rent multiplier factor remains 2.75%.