### In re MELGAR ENTERPRISES, INC., Debtor.

**Bankruptcy No. 191–18688–260.**

United States Bankruptcy Court, E.D. New York.

Feb. 22, 1993.

---

Shaw, Licitra, Parente, Esernio & Schwartz, P.C. by John H. Hall, Jr., Eric Brown, Garden City, NY, for debtor.

Siegel, Sommers & Schwartz by James A. Beldner, New York City, Katten Muchin & Zavis by Synde B. Keywell, Jeff Marwil, Chicago, IL, for Amber Shires Ltd. Partnership.

Office of the U.S. Trustee by Douglas E. Spelfogel, Garden City, NY.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

This matter is before the Court on the motion of the Debtor, Melgar Enterprises, Inc. ("Melgar" or the "Debtor"), which seeks an order pursuant to 11 U.S.C. §§ 105 and 506(a) and Fed.R.Bankr.P. 3012 determining the value of the secured claim of Amber Shires Limited Partnership ("Amber Shires"). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). For the reasons hereinafter set forth, the Court finds the value of the secured claim of Amber Shires to be $5,642,000.

## FACTS

The Court has already discussed the facts leading up to the Debtor's bankruptcy in a decision dated May 12, 1992, and reported as *In re Melgar Enterprises, Inc.*, 140 B.R. 43 (Bankr.E.D.N.Y.1992). The Debtor is a corporation formed to develop and market approximately 212 acres of land located in the Village of Lemont ("Lemont") in Cook County, Illinois. The Debtor purchased the property in December of 1987 for approximately $7,150,000 ($32,949 per acre). Amber Shires is a secured creditor holding a valid, mortgage lien on the subject property and is owed in excess of $6,955,286.

In 1986, the prior owners of the subject property entered into an Illinois State Court ordered stipulation with Lemont which provided for the development of the property (the "Consent Decree"). The Consent Decree designated the property as a Planned Unit Development ("PUD"). According to the Debtor, the PUD approves and provides for all necessary zoning, stabilizes certain fees at 1986 rates and allocates and pre-approves certain licenses including those for restaurants and liquor. Additionally, the PUD authorizes a higher density of development than other similar developments in the area. The Consent Decree and PUD outline development of the property as follows:

(1) 68 acres for 206 single family residential lots;

(2) 40 acres for 278 townhouses;

(3) 30 acres for 276 manor homes;

(4) 9 acres for 120 condominium units;

(5) 9 acres for 120 apartment units;

(6) 10 acres allocated to 50,000 sq. ft. of office and commercial space;

(7) 16 acres for 90,000 feet of commercial space; and

(8) 30 acres for 227,000 sq. ft. of light industrial and research space.

On December 31, 1991, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code in this Court. Following the expiration of the Debtor's exclusivity period pursuant to § 1121 of the Bankruptcy Code, Amber Shires filed a liquidating plan of reorganization on June 9, 1992.[1] The Debtor filed its plan of reorganization on July 16, 1992. The Debtor's plan involved developing the infrastructure of the

---

1. § 1121 states in relevant part:
    (b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

**36**

68 acres allocated to single family residences and then selling the remaining lots within that area to building contractors or potential homeowners.

Hearings were subsequently held before this Court on both plans and disclosure statements. Thereafter, both Amber Shires and the Debtor amended their respective plans and disclosure statements. On October 5, 1992, the Court approved each party's disclosure statement. On October 29, 1992, the Debtor filed the present motion to value the secured claim held by Amber Shires. Both parties submitted appraisals of the subject property. On December 21, 1992, the Court entered a scheduling order directing the parties to submit memoranda of law regarding the appropriate methodology for determining the value of the property, addressing the contents, findings and conclusions of each appraisal.

A. *Amber Shires' Appraisal*

The Amber Shires appraisal (the "McCann appraisal") was performed by William A. McCann, M.A.I. and Philip L. Groebe. In conducting the appraisal, McCann examined Cook County, in which the subject property is located, and five other counties comprising the Chicago Metropolitan Area (the "CMA"). He found that the majority of growth in the CMA was taking place not in Cook County but rather in DuPage County and the other counties. McCann characterized land development in Lemont Township as being slow in comparison to other Chicago area development. He supported this conclusion by explaining that the presence of the Moraine Valley makes Lemont Township a less desirable area to live in than residential communities located to the North of the property in DuPage County.

In terms of the subject property, McCann noted that near the subject site, significant amounts of vacant, zoned land were available with utilities capable of supporting a full range of residential, commercial and industrial/manufacturing uses. Additionally, he observed that further engineering and architectural approvals may be needed as significant problems exist which are not covered by the PUD.

After evaluating the market conditions and the area, McCann found that the proposed use of the site by the Debtor was not currently feasible or even likely to occur in the reasonably foreseeable future. McCann based this conclusion on the fact that: (1) the market for residential housing is very soft as many areas are in default and land prices have been further depressed by recent sales at auction; (2) competing office and research developments along established highways will prevent the site from supporting such uses; and (3) the rural nature of Lemont combined with the current population density is not enough to support commercial development at the subject property.

It was McCann's opinion that industrial development would ultimately be unsuccessful as a result of competition from already completed industrial parks having superior expressway access. Thus, he felt that the acreage zoned industrial should be developed as residential even though this would require modifying the PUD.

In light of the foregoing, McCann concluded that the highest and best use[2] of the property as of October 26, 1992, was primarily for residential development rather than development in accordance with the PUD. Although designating the property as residential would require changing the PUD, he felt that such a modification would yield the highest value for the property.[3]

Since McCann determined the highest and best use of the property would be accomplished through residential development, he therefore valued the property in its present condition as vacant land. To properly value vacant land, McCann chose

**2.** The highest and best use of a property is that use which is reasonably available, financially feasible and results in the highest value of the property.

**3.** Amber Shires supports this conclusion by noting that one potential purchaser of 40 acres of the property stated in its letter of intent that any purchase would be contingent on, among other things, a modification to the PUD.

to utilize a sales comparison approach. He then compared the subject property to six purchases of undeveloped land all within 1.6 miles of the site as appears from the annexed Appendixes A and E. On an unadjusted basis, the six properties range between $11,207 to $26,286 per acre. After adjusting for size, location, physical characteristics, zoning, time of sale and availability of sewer and water for each site, the price range per acre was between $22,000 and $27,000. McCann concluded that the property is within the higher range of the adjusted values and therefore he appraised the property at approximately $24,000 per acre or $5,200,000 total.

## B. *Melgar's Appraisal*

To support its value of the property, the Debtor presented an appraisal as of January 1, 1988, a reappraisal using the same methodology prepared in August 1991 and an analysis of recent homesite sales. The 1988 appraisal valued the property at approximately $11,945,400 and was prepared by Peter Jackson in conjunction with Karen Krieger, MAI. Krieger alone did the 1991 reappraisal which valued the property at $12,600,000.[4]

According to the Debtor, the PUD renders existing valuation methods inadequate to accurately assess the fair market value of the property. Thus, the Debtor's appraisals employ a "hybrid technique" combining the "sales comparison" with a quasi-subdivision approach.[5] The Debtor admits that Krieger's approach does not comply with the standards set forth by the American Institute of Real Estate Appraisers.

The 1991 reappraisal by Krieger is an almost verbatim copy of the 1988 Jackson-Krieger appraisal including the same analysis, conclusions and spelling errors[6]. The 1991 reappraisal contains the same cursory

analysis of the CMA contained in the 1988 appraisal. Like the 1988 appraisal, the 1991 appraisal contains an extensive description of DuPage County even though the subject property is located in Cook County. In profiling the Village of Lemont, the only difference between the 1991 and 1988 appraisals is that Krieger apparently "whited out" the old population numbers and replaced them with more current ones. Her observations regarding rapid growth in both Lemont and the area around the subject property are the same as those in the 1988 appraisal. Like the 1988 appraisal, Krieger determined that the highest and best use of the property was to develop it in accordance with the PUD.

According to Krieger, the purpose of her analysis was to estimate the value of the property as zoned finished lots, i.e., with all roads, sewers and other utilities complete and in place. In accordance with the PUD, she analyzed the property by breaking it down into its zoning categories.

In analyzing the value of the land as vacant, Krieger used the sales comparison method and examined three properties all of which were outside Lemont Township and whose distance from the subject property range from 4.8 to 11.4 miles as appears from annexed Appendixes B and E. On an unadjusted basis, the three properties range between $18,047 to $81,081. After adjusting for time, location and size, the price range per acre was $21,656 to $64,865. Krieger concluded that the property fell in the midpoint of this range and selected $40,000 per acre.

Krieger examined the sale of five different residential lots in Lemont for her comparable homesite sales. However, at least four of these lots were in a finished state, possessing streets and utilities. After ad-

---

4. According to the Appraisal Institute, Jackson has been suspended from practice as an appraiser since March 9, 1990, for violating Ethical Rule 1–2 dealing with misconduct leading to a conviction of a crime involving fraudulent or dishonest behavior. Letter from Brendan Donnelly, Ethics and Counseling Dept. of the Appraisal Institute to T.K. Khan, Katten Muchin & Zavis (January 13, 1993) (discussing suspension of Peter Jackson).

5. A subdivision method is one in which unimproved real property is valued under the assumption that it can be developed and sold as a successful subdivision.

6. The word "congestion" is misspelled on page 18 of both the 1988 and the 1991 appraisals.

justing for size, time and location, Krieger found that the adjusted price per lot was between $52,500 to $55,000. It was her conclusion that the finished value of each acre would be $54,000.

Krieger's examination of multifamily land sales involved three properties, two of which were included in the older 1988 appraisal as appears from the annexed Appendix C. Of the three properties, only one is located in Lemont as appears from the annexed Appendix E. Krieger concluded that the appropriate value for the 70 acres designated for town homes was $2.00 per sq. ft. and $3.00 per sq. ft. for the 18 acres of land set aside for low rise apartments and condominiums. Krieger then calculated the value of only 9 acres of land "as is" at $1,176,120 [7] and then added development costs of $450,000 ($50,000/acre) to reach a total value of $1,600,000. She then derived a unit price of $13,333.

Krieger's examination of commercial land sales involved five properties, two of which were included in the older 1988 appraisal as appears. from the annexed Appendix D. None of the five properties were located in Lemont as shown in the annexed Appendix E. Krieger concluded that the appropriate value for the commercial property would be $3.00 per sq. ft.

The four industrial land sales examined by Krieger were each approximately five miles from the subject property and all were in either Romeoville or Bolingbrook, Illinois as shown in the annexed Appendix E. She valued the industrial property at $2.50 per sq. ft. increasing to $3.00 sq. ft. if subdivided and in a ready-to-build stage.

Krieger then conducted a residential subdivision analysis based upon the PUD and incorporating construction costs and future sales. As a result, she calculated the retail value of the land as follows:

1. Single family residence—$54,000 per acre
2. Multi-family land sales—$1,600,000
3. Commercial land sales—$3.00 per sq. ft.
3. Industrial land sales—$2.50 per sq. foot

Krieger felt that the raw land could be developed into a ready-to-build state for $50,000 per acre. However, she did not independently calculate this figure but in-

stead received it from one William Edwards, a brother of a friend of hers. In turn, Edwards calculated the development costs based on the costs incurred in building a subdivision in Darien, Illinois.

In her conclusion, Krieger noted that the purpose of the appraisal was to estimate the value of the lots in their finished state, i.e., with all roads, sewers and other utilities complete and in place. The commercial portion of the property was valued as is. Thus, Krieger appraised the subject property as follows:

(1) discounted residential subdivision — $ 5,600,000
(2) present value of rental apt. land — $ 1,600,000
(3) present value of commercial land — $ 2,800,000
(4) present value of office/research — $ 2,550,000

ADJUSTED TOTAL $12,600,000

As raw land, Krieger felt that the property would be worth $40,000 per acre.

In October, 1992, Krieger re-visited the property and analyzed actual homesite sales occurring in 1992. Krieger found that the lots sold in a price range between $50,000 to $70,000 and therefore, she determined that such sales confirm her estimates in the 1991 appraisal.

Both sides have challenged the appropriateness of the other's appraisal technique and methodology. Amber Shires asserts that the Debtor's appraisal is wholly inappropriate while the Debtor claims that the McCann appraisal is inadequate to value the property in that it fails to account for the unique nature of the property resulting from the PUD. In the event that a "sales comparison" technique is the proper approach, Melgar argues that McCann's properties are not truly comparable.

## DISCUSSION

Section 506(a) of the Bankruptcy Code governs the valuation of collateral. It states in relevant part:

Such value shall be determined in light of the purposes of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing

7. $3.00 multiplied by 392,040 (sq. footage of 9 acres).

on such disposition or use or on a plan affecting such creditor's interest.

◼◼◼ The Bankruptcy Code does not set forth any bright line method to conduct valuation hearings. *In re Monica Road Assocs.,* 147 B.R. 385, 390 (Bankr.E.D.Va. 1992) (courts have wide latitude in determining value); *In re Peerman,* 109 B.R. 718, 721 (Bankr.W.D.Tex.1989) (Bankruptcy Code does not set forth the manner or basis upon which valuation is to be conducted, quoting King, *3 Collier on Bankruptcy,* § 506.04 at 506–25 (15th Ed.1992)); *In re QPL Components, Inc.,* 20 B.R. 342, 344 (Bankr.E.D.N.Y.1982) (statutory language of § 506 offers less than specific guidance on the question of value). Rather, the legislative history of § 506 clearly states that valuation is to be determined on a case-by-case basis. H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* U.S.Code Cong. & Admin.News 5787, 6312; S.Rep. No. 989, 95th Cong., 1st Sess. 68, *reprinted in* U.S.Code Cong. & Admin.News 5787, 5854. *See In re Balbus,* 933 F.2d 246, 249 (4th Cir.1991); *In re Sutton,* 904 F.2d 327, 330 (5th Cir.1990); *Monica Road Assocs.,* 147 B.R. at 390; *In re Richardson,* 97 B.R. 161, 162 (Bankr. W.D.N.Y.1989); *QPL Components,* 20 B.R. at 345. If property is to be used and retained by the debtor, application of § 506(a) requires that a court value the property in a manner consistent with its use. King, *3 Collier on Bankruptcy,* § 506.04 at 506–27 (15th Ed.1992). Where the prospects for reorganization appear good, the value should be a fair market or going concern value. *Id.* at 506–28. However, if the prospects for a successful reorganization appear dim, disposition value is more appropriate. *Id.* Where the nature of the debtor's prospects are not absolutely clear, the valuation should consider the probability of all material possibilities in arriving at a value. *Id.* at 506–29. In so doing, it is proper to consider the condition and location of the property. *See Id.* at 506–32 n. 39 citing cases.

◼◼◼ Here, this Court must determine the amount of a secured claim for purposes of a Chapter 11 plan. Thus, the value should

be determined in close proximity to the effective date of the plan. *Id.* at 506–37 n. 54 citing cases; *In re Savannah Gardens–Oaktree,* 146 B.R. 306, 308 (Bankr.S.D.Ga. 1992); *In re Seip,* 116 B.R. 709, 710 (Bankr.D.Neb.1990). *See also In re Turnbow,* 121 B.R. 11, 13 (Bankr.S.D.Tex.1990) (declining to value property as the hearing was too far removed in time from the confirmation hearing).

I. *Highest and Best Use*

◼◼◼ Most courts have agreed that property should be valued according to its highest and best use. *In re Stockbridge Properties I, Ltd.,* 141 B.R. 469, 471 (Bankr. N.D.Ga.1992) (property should be valued at the highest and best use that is reasonably available); *Peerman,* 109 B.R. at 722 (first requirement of § 506 is to determine the highest and best use of the property). In order to properly determine the highest and best use of property, there must be a need and demand for the type of use proposed. McCann, William A. (MAI), "The Real Estate Appraiser's Role As An Expert Witness in Zoning Matters", *The Appraisal Journal,* the Appraisal Institute, January, 1991. (vol. LIX pp. 76–80) (this is the same William A. McCann whose appraisal is the subject of this opinion).

The Court notes that McCann is extremely well-versed in the art of real estate appraising. He has been involved in real estate appraising since 1958, lectures regularly before the Society of Real Estate Appraisers and has taught courses in several Chicago area colleges. His appraisal contained comprehensive profiles of Lemont and the subject property which have persuaded the Court that, in light of competition from other better located and established commercial areas, the property will be unable to support industrial and commercial development. Given the foregoing, the Court accepts McCann's view that the highest and best use of the property is for residential development. Krieger's conclusion to the contrary is flawed inasmuch as she apparently overlooked the growth patterns in Lemont and instead emphasized the growth in DuPage County. Krieger's

verbatim copying of the regional and neighborhood analysis from the 1988 appraisal makes her conclusions even more suspect.

## II. *Appropriate Appraisal Methodology*

■ As recognized by both Amber Shires and the Debtor, there are three general appraisal techniques available to determine the fair market value of property.[8] Appraisal of Karen A. Krieger, MAI 43 (June 27, 1991); Appraisal of William A. McCann, MAI 32 (October 26, 1992). *See In re Tamarack Trail Co.*, 23 B.R. 3, 5 (Bankr.S.D.Ohio 1982). The first technique is the market or sales comparison approach which is based upon evidence of comparable sales. *Id.* The second is the cost or land development approach in which the actual costs of construction are reduced for depreciation. *Id.* The third is the capitalization of income approach which capitalizes the net future income that the property is capable of producing. *Id.* Additionally, some appraisers use the subdivision method despite it being described by the American Institute of Real Estate Appraisers as highly controversial. American Institute of Real Estate Appraisers, *Subdivision Analysis* (1978).

In the case at hand, both the Debtor and Amber Shires submitted their own appraisals, each employing different valuation techniques. Amber Shires employed William McCann, a highly experienced appraiser, who used a sales comparison approach. In contrast, the Debtor employed Karen Krieger, who did not conduct her own independent appraisal but instead simply updated the 1988 appraisal performed by Peter Jackson. The Court notes that Jackson was unable to do the update himself as he has been suspended from practice as an appraiser since March 9, 1990.

At the outset, the Court finds the condemnation cases relied on by each party are not on point. The Court also finds the use of "hybrid method" employed by Krieger to be inappropriate and unsupported by case law. As admitted by the Debt-

or, the Krieger appraisal does not comply with the standards espoused by the American Institute of Real Estate Appraisers nor does it conform to the requirements of a subdivision analysis. A hybrid approach which combined market and income techniques was recently rejected by a court in favor of a sales comparison approach. *Stockbridge Properties*, 141 B.R. at 472 (valuation of undeveloped land for the purposes of confirming a plan).

The Debtor relies on *In re Savannah Gardens–Oaktree*, 146 B.R. 306 (Bankr. S.D.Ga.1992) and *In re Unimet, Corp.*, 74 B.R. 156 (Bankr.S.D.Ohio 1987) as supporting the use of hybrid techniques. Inasmuch as each case involved the valuing of an already constructed building, the Court considers neither case to be particularly useful for the issue at hand: the valuing of vacant land. Furthermore, in scrutinizing these cases, it is apparent that neither case actually supports the use of a "hybrid" appraisal method.

In *Savannah Gardens–Oaktree*, the court valued an apartment complex for the purpose of determining whether a secured creditor would be adequately protected over the life of the debtor's plan. 146 B.R. at 308. Since the plan involved renovating the apartments, the only way to be sure that the apartment complex adequately protected the creditor's secured claim was to value the complex in both a current and renovated state. *Id.* at 310–12. Both the debtor and creditor submitted appraisals valuing the apartment under an income approach and under a market approach. *Id.* The court rejected the creditor's appraisals due to flaws in the appraisal formulas used. *Id.* In examining the debtor's appraisals, the court noted that the value of the renovated apartment under the income approach was $7,850,000 and was $8,000,000 under the market approach. *Id.* Under both approaches, the current value of the building was $7,000,000. *Id.* The court found the value of the building in its current state to be $7,000,000. *Id.* at 312.

---

**8.** Fair market value assumes a sale of the property between a willing buyer and seller in which both parties are fully informed, act reasonably,

and are unaffected by undue pressure. *Stockbridge Properties*, 141 B.R. at 472.

In finding the value of the renovated apartment complex, the court apparently followed the income approach since it valued the building at $7,850,000 upon renovation. *Id.*

The Debtor's reliance on *Unimet* is similarly misplaced. In *Unimet,* the court considered the value of two industrial plants for tax purposes. 74 B.R. at 158. The debtor's appraisals valued each plant under a cost approach and also under a sales comparison approach. *Id.* at 160. In valuing the first plant, the appraiser chose the cost approach value of $1.064 million since he felt that the comparable properties were not similar enough to the building. *Id.* The court accepted this value and noted that it was supported by the sales comparison value of $1.006 million. *Id.* at 167. In valuing the second building, the appraiser found the $800,000 value under the sales comparison approach to be more reliable than the $806,000 value under the cost approach. *Id.* at 160. The court however, adjusted the depreciation under the cost approach and therefore derived a value of $766,400. *Id.* at 167. The court then valued the building at the average of the two methods. *Id.* Thus, neither case supports the Debtor's use of a "hybrid" method of appraisal.

Although not cited by either party, the Court finds the case of *In re Tamarack Trail Co.,* 23 B.R. 3 (Bankr.S.D.Ohio 1982), to be particularly germane. In *Tamarack Trail,* stockholders objected to the confirmation of a creditor's reorganization plan cancelling their shares in the debtor. *Id.* at 5. To decide if the plan was capable of being confirmed, the court found it necessary to value a 49 acre tract of land which the debtor had purchased with the intention of developing and building condominiums for resale. *Id.* The debtor had partially completed construction on eleven buildings[9] covering six acres of land and had left the other forty-three acres vacant. *Id.* at 5–6.

The debtor and its appraiser argued that the buildings should be valued on the basis of a completed condominium project with all amenities[10] in place despite the fact that neither the amenities nor parking surfaces and landscaping were in place. *Id.* at 5. The court rejected this approach and instead held that the "law requires us to value the project as it stands today." *Id.* In selecting which appraisal to use, the court rejected the cost approach urged by the debtor and instead chose to value the property under a market approach. *Id.* at 6. In so doing, the court stated that "the market approach [sales comparison] is the sounder appraisal technique for it is more closely related to the realities of the given situation than a theoretical cost of construction." *Id.* *See Stockbridge Properties,* 141 B.R. at 472 (rejecting use of hybrid approach in favor of a sales comparison approach). Furthermore, the *Tamarack Trail* court noted a cost approach would be acceptable in this situation only if no reasonable information existed as to comparable sales. *Tamarack Trail,* 23 B.R. at 6.

In examining comparable properties selected by the debtor, the *Tamarack Trail* court rejected them for being more or less remote from the property at hand and unlike the subject property, they were in projects which had been completed with all amenities in place. *Id.* Similarly, when valuing three buildings in which construction had not even begun, the court declined to adopt the values of the projects with amenities and instead valued them exactly as they were, i.e., vacant land. *Id.* at 5–6. In valuing the forty-two acres of vacant land, the court discarded evidence of land sales from completely developed condominium complexes and instead valued it in its present state. *Id.* at 7.

This Court's conclusion that the land must be valued in its present state is further bolstered by *In re Boca Dev. Assocs.,* 21 B.R. 624, 625 (Bankr.S.D.N.Y.1982) which occurred in the context of a credi-

---

**9.** The eleven buildings were in different stages of construction ranging from completed to not even begun. *Tamarack Trail,* 23 B.R. at 4.

**10.** Amenities referred to included tennis courts, clubhouse, swimming pool, etc. *Tamarack Trail,* 23 B.R. at 5.

tor's motion to lift the automatic stay. In rejecting five of six comparable sales submitted by the debtor for the court's consideration, the court stated that the five properties had improvements such as sidewalks, underground utilities, street lighting and roads while the debtor's property had none of those. *Id.* at 628. Therefore,. the court examined the sixth sale which was the only sale of vacant land. *Id.* In adopting the creditor's appraisal value of $25,000 per acre, the court noted that it was supported by the sixth comparable sale which valued the property at $24,400 per acre. *Id. See In re Carson,* 34 B.R. 502, 504 (Bankr. D.Kan.1983) (rejecting debtor's appraisal based on "anticipated and uncertain developments" in favor of lender's appraisal based on the present condition of the land).

■ It is evident to this Court that the sales comparison model followed by McCann is more probative of the value of the property than the Krieger approach. Even if the Court were inclined to accept a "hybrid" appraisal, the Krieger appraisal contains significant flaws which render her appraisal of little or no value in this proceeding. As stated by Krieger, the purpose of her appraisal was to estimate the value the lots when sold in a finished state. However, in the context of this bankruptcy proceeding, the property must be valued in its present state which is as vacant land. *Carson,* 34 B.R. at 504; *Tamarack Trail,* 23 B.R. at 5; *Boca Dev.,* 21 B.R. at 628. Therefore, those properties possessing roads, etc. examined by Krieger cannot be considered comparable and must be disregarded. *Id.*

Further, many of the other properties deemed comparable by Krieger are rejected as being too remote and dissimilar to the subject property. All three of Krieger's purchases of vacant land took place before October 1989. Additionally, as shown in the annexed Appendix E, none of these three properties are even located within Lemont Township [11]. In fact, many of Krieger's comparable properties are located in DuPage County rather than Cook County or Lemont Township where the actual property is located. As noted, DuPage is one of the fastest growing counties around Chicago and therefore differs notably from Lemont. Thus, properties in DuPage County are not comparable to those in Lemont. Additionally, many of Krieger's comparable properties cannot be considered similar as they are small parcels of fully improved land surrounded by existing subdivisions.

Finally, Krieger's development costs of $50,000 per acre are unsupported and will not be accepted by this Court. As was previously noted, Krieger was given her development figures by her friend's brother, William Edwards, who was working in DuPage County. Neither the Debtor nor Krieger verified this figure by comparing the physical condition at Edward's site with the subject property. Furthermore, Krieger testified that she was not provided with any engineering studies to support her assumptions about site costs. Without the proper development costs, the entire subdivision analysis performed by the Debtor is flawed.[12]

### III. *Proper Value of The Property*

The court is satisfied with the findings and conclusions as contained in the McCann appraisal. His comparable properties were all within 1.6 miles of the subject property and included one property containing a PUD. However, McCann himself stated that the property belonged at the high end of the .$22,000–$27,000 range. Curiously, McCann chose to value the property at $24,000 per acre which is not even the

---

11. As shown in the annexed Appendix E, the actual distance of the properties ranged from 4.75 miles to 11.4 miles from the subject property.

12. Krieger also failed to include an analysis of absorption rates over time and she also averaged her cash inflows and outflows over the length of the project without adjusting for front-end costs which tend to be larger. According to the American Institute of Real Estate Appraisers, averaging annual cash inflows and outputs can produce misleading and erroneous value conclusions and is particularly inappropriate when large initial front end costs are incurred. American Institute of Real Estate Appraisers, *Subdivision Analysis,* at 4 (1978).

midpoint of the price range. Accordingly, the court believes that the price per acre should be adjusted upwards by $2,000 per acre. Accordingly, the value of the property is $26,000 per acre for a total of $5,642,-000.

### CONCLUSION

The Court believes that the highest and best use of the property is as set forth in the McCann appraisal. Thus, the proper method of valuing the subject property is through the sales comparison approach. Inasmuch as the Debtor did not utilize this approach and also did not examine properties within the vicinity of the subject property, the Court rejects the Debtor's appraisal methodology and conclusions. In light of the foregoing, this Court finds the value of the subject property to be $5,642,-000 and by reason thereof and in accordance with the provisions of § 506(a), the secured claim of Amber Shires is fixed at $5,642,000.

SUBMIT AN ORDER CONSISTENT WITH THIS OPINION.

### APPENDIX A
### McCANN APPRAISAL

| LOCATION | DATE OF SALE | ACREAGE | PRICE/AC | PRICE |
|---|---|---|---|---|
| Lemont * | 1987–89 | 350.4 | $15,205 | $5,327,832 |
| Lemont | 11/90 | 20 | $17,760 | $ 355,200 |
| Lemont | 3/90 | 29 | $11,207 | $ 325,003 |
| Lemont | 1/90 | 29.5 | $20,064 | $ 591,888 |
| Lemont | 3/90 | 17.5 | $26,286 | $ 460,005 |
| Lemont | 5/92 | 72.9 | $26,600 | $1,939,140 |

* Zoned as PUD

### APPENDIX B
### RESIDENTIAL PROPERTY-KRIEGER

| LOCATION | DATE OF SALE | ACREAGE | PRICE/AC | PRICE |
|---|---|---|---|---|
| Woodbridge | 9/89 | 28.14 | $50,995 | $1,434,999 |
| Brementownship ** | 8/87 | 49 | $18,047 | $ 884,303 |
| Downers Grove | 6/88 | 18.50 | $81,081 | $1,499,998 |

** Also used in the 1988 appraisal

### APPENDIX C
### MULTI-FAMILY PROPERTY—KRIEGER

| LOCATION | DATE OF SALE | SQ. FT. | PRICE SQ. FT. | PRICE |
|---|---|---|---|---|
| Lemont ** | 10/87 | 37,375 | $1.61 | $ 60,173 |
| Tinley Park | 7/87 | 479,000 | $1.20 | $ 574,800 |
| Downers Grove | 10/84 | 805,860 | $2.51 | $2,022,708 |
| Orland Park *** | 10/87 | 117,612 | $3.03 | $ 356,364 |

* Zoned as PUD

### APPENDIX D
### COMMERCIAL PROPERTY-KRIEGER