PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1889
_____

In re: Heritage Highgate, Inc. and
Heritage Twin Ponds, L.P.,
Debtors

Charles Scagliotti IRA, Frank Cortese IRA,
Gerald Bowes IRA, Gary Cortese IRA,
George Mee Marital Trust, TomParks IRA,
Pollock Family L.P., Robert Preston IRA,
John Rogers, Lynne Summers Marital Trust,
John R. Yaissle IRA,
Yee III Trust Highgate and Robert Preston
(collectively "Cornerstone Investors"),
Appellants
_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 1-10-cv-02837)
District Judge: Honorable Jerome B. Simandle
_____

Argued March 20, 2012

Before: RENDELL, FISHER and
CHAGARES, <u>Circuit</u> <u>Judges</u>

(Opinion Filed: May 14, 2012)
_____

Albert A. Ciardi, III, Esq.
Nicole M. Nigrelli, Esq.
Ciardi Ciardi & Astin
2005 Market Street
One Commerce Square, Suite 1930
Philadelphia, PA 19103
    *Counsel for Debtors*

Joseph S. D'Amico, Jr., Esq.
Douglas J. Smillie, Esq.    **[ARGUED]**
Fitzpatrick, Lentz & Bubba
4001 Schoolhouse Lane
Stabler Corporate Center, P.O. Box 219
Center Valley, PA 18034
    *Counsel for Plaintiff-Appellant*
    *Cornerstone Investors*

Samuel H. Israel, Esq.    **[ARGUED]**
Joshua T. Klein, Esq.
Michael G. Menkowitz, Esq.
Fox Rothschild
2000 Market Street, 20th Floor
Philadelphia, PA 19103

Michael J. Viscount, Jr., Esq.
Fox Rothschild
1301 Atlantic Avenue
Suite 400, Midtown Building
Atlantic City, NJ 08401
  *Counsel for Defendant –Appellee*
  *Unsecured Creditors Committee*

_____

OPINION OF THE COURT
_____

RENDELL, <u>Circuit Judge</u>.

This appeal requires us to decide how bankruptcy courts should value collateral retained by a Chapter 11 debtor in order to determine the amount of a creditor's secured claim under 11 U.S.C. § 506(a). Appellants, a group of creditors known as the Cornerstone Investors, claim that the Bankruptcy Court erred by valuing their secured claims at zero based on an appraisal of Debtors' real estate offered by the Official Committee of Unsecured Creditors. We conclude that the Bankruptcy Court did not err in its valuation of the real estate, and that it properly determined that the Cornerstone Investors held only unsecured claims. In so concluding, we also clarify the burden of proof with respect to such valuations in the § 506(a) context.

I. <u>Background</u>

Debtors Heritage Highgate, Inc. and Heritage-Twin Ponds II, L.P. embarked upon the development of a residential subdivision in Lehigh County, Pennsylvania (the

3

"Project") in August 2005.  The Project was to consist of townhouses and single-family detached homes.

Debtors entered into a series of construction loan agreements, first borrowing from a group of banks led by Wachovia (the "Bank Lenders").  Pursuant to their agreement, the Bank Lenders retained a lien on substantially all of Debtors' assets as collateral for the loan.  Debtors subsequently borrowed from several individuals and entities, known collectively as the Cornerstone Investors.  Pursuant to those agreements, the Cornerstone Investors similarly received liens, of equal priority with the Bank Lenders and each other, on substantially all of Debtors' assets.  The Cornerstone Investors, however, later agreed to subordinate their secured claims to the secured claim of the Bank Lenders in a set of intercreditor agreements.

On January 20, 2009, after building and selling approximately a quarter of the planned units, Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On June 9, 2009, Debtors filed a joint proposed plan of reorganization, which provided that they would complete development of the subdivision and make distributions to their creditors according to a set of projections.  In the initial proposed plan, Debtors projected that they would first pay the secured claim of the Bank Lenders in full, then pay the secured claims of the Cornerstone Investors in full, and thereafter pay all unsecured claims at a rate of approximately 20% each, from the funds earned through lot sales.

In connection with a contested cash collateral hearing,[1] Debtors offered an appraisal of the Project prepared by an experienced real estate appraisal company, Reaves C. Lukens, in February 2009 to demonstrate the worth of their collateral. The 140-page appraisal set forth in detail the company's estimation of the real estate development's fair market value pursuant to two well-accepted appraisal methodologies, the sales comparison approach and the income capitalization approach.[2] According to the appraiser, both analyses "were

---

[1]Cash collateral includes "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents . . . in which the estate and any entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property." 11 U.S.C. § 363(a). To continue using the cash collateral of a secured lender, a Chapter 11 debtor must either obtain consent from the secured lender or obtain the Bankruptcy Court's authorization. *Id.* § 363(c)(2). In the event a secured creditor does not consent and the Bankruptcy Court's authorization is sought in a contested hearing, the Chapter 11 debtor must demonstrate that the secured creditor is adequately protected. *Id.* § 363(e), (p). Forms of adequate protection are set forth at 11 U.S.C. § 361, and include other collateral that has value in excess of the secured creditor's claim or a budget that provides for the continued operation of the debtor's business without detriment to the secured lender's position.

[2]The sales comparison approach and income capitalization approach are two techniques frequently used by appraisers in arriving at the fair market value of land. *See In re Tamarack Trail Co.*, 23 B.R. 3, 5 (Bankr. S.D. Ohio 1982)

well supported by market evidence" and yielded virtually identical estimations. The appraiser favored the results of the latter because it "more accurately considered the time and expenses" related to a real estate development like the Project. The Bankruptcy Court accepted the appraiser's calculation of the Project's fair market value as approximately $15 million, which was then sufficient to cover the entirety of the secured debt.

On September 4, 2009, the Official Committee of Unsecured Creditors (the "Committee") filed a motion to value the secured claims of the Cornerstone Investors pursuant to 11 U.S.C. § 506(a) and Federal Rule of Bankruptcy Procedure 3012. The Committee claimed that the Bankruptcy Court should value the secured claims at zero because the collateral securing the Cornerstone Investors' liens, the Project, was worth less than the Bank Lenders' senior secured claim. As proof of the collateral's worth, the Committee submitted the February 2009 appraisal previously accepted by the Bankruptcy Court as evidence of the Project's fair market value at the contested cash collateral hearing. However, when reduced by interim sales, the fair market

---

(noting that there are "three appraisal techniques . . . available to appraisers," two of which are the sales comparison and income capitalization approaches). The sales comparison approach is a method of analyzing sales of similar recently sold parcels to arrive at a probable sale price for the property being appraised. The income capitalization approach is a method in which the appraiser estimates the value of land based upon the present value of the income stream to be generated by the sale of the individual lots within the development over an estimated holding period.

value was approximately $9.54 million.[3] The Committee urged that, because this amount was insufficient to pay the Bank Lenders in full, the secured claims of the Cornerstone Investors were valueless. In response, the Cornerstone Investors argued that their claims should be deemed wholly secured because projections that accompanied the plan filed by Debtors estimated that Debtors would derive revenue from the Project sufficient to pay their claims in full. The parties agreed to postpone consideration of the motion until after confirmation of the reorganization plan.

On March 2, 2010, Debtors submitted their final plan of reorganization. The plan specified that claims of the Cornerstone Investors would be secured to the extent determined by the Bankruptcy Court in ruling on the Committee's motion. The final plan included a projected budget that anticipated full payment of both the Bank Lenders' senior secured debt and the Cornerstone Investors' junior secured debt through the development and sale of lots with completed townhouses and single-family homes over the course of 47 months. According to the budget, unsecured claimants would receive distributions amounting to approximately 45% of their claims. No interested party, including the Cornerstone Investors, objected to Debtors' final plan of reorganization. On April 1, 2010, the Bankruptcy Court entered an order confirming the plan. The Bankruptcy Court concluded, as required by 11 U.S.C. § 1129(a)(11), that the plan was feasible, i.e., that further

---

[3]Sales following the appraisal generated approximately $5.45 million in proceeds, which were used to fund operations, including payment of some principal and interest to the Bank Lenders.

liquidation or reorganization beyond the plan's provisions would be unlikely.

With the plan confirmed, the Bankruptcy Court took up the Committee's motion to value the Cornerstone Investors' secured claims. On April 14, 2010, the parties filed joint stipulations of fact to assist the Bankruptcy Court in ruling on the motion. They agreed that the Bank Lenders were then owed approximately $12 million, while the Cornerstone Investors were owed approximately $1.4 million. Debtors and the Cornerstone Investors stipulated that the appraised value of the Project should be reduced due to Debtors' sale of lots since the appraisal's completion on February 21, 2009, and that, "[b]ased on the Appraisal, the total fair market value of the Project as of the Confirmation Date [wa]s $9,543,396.23." Additional assets held by Debtors raised the total value of the collateral securing liens to $11,165,477.15.

On May 3, 2010, the Bankruptcy Court held a hearing on the Committee's motion. At the hearing, the Committee reiterated its argument that the appraisal, as adjusted, reflected the worth of the Project in accordance with § 506(a) — namely, its fair market value as of confirmation. The appraisal, argued the Committee, demonstrated that the fair market value was less than the Bank Lenders' secured claim, such that no value remained to secure the Cornerstone Investors' liens. While they agreed that the appraisal depicted the Project's fair market value, the Cornerstone Investors contended that it did not control because § 506(a) requires that the value of property "be determined in light of [its] proposed disposition or use" and the plan budget demonstrated that the Debtors would be able to pay their claims in full over time as more homes were sold. They also

8

urged the court to adjudge their claims fully secured, arguing that to deprive them of Project revenue to be generated over and above the appraisal value would constitute impermissible lien stripping.

The Bankruptcy Court agreed with the Committee. It determined that the proper method of valuing the Cornerstone Investors' secured claims was the fair market value of the Project as of the plan's confirmation date. The Cornerstone Investors did not dispute the accuracy of the fair market value set forth in the appraisal, choosing instead to rely upon the plan budget. The Bankruptcy Court accepted the appraisal as a proper basis for the valuation. Because the amount remaining due on Debtors' obligation to the Bank Lenders exceeded the sum of the Project's fair market value and the value of other assets held by Debtors, no collateral remained to secure the Cornerstone Investors' claims. Therefore, the Bankruptcy Court ruled, the Cornerstone Investors would be treated as unsecured creditors.

The Cornerstone Investors appealed the Bankruptcy Court's ruling to the District Court for the District of New Jersey. The District Court affirmed the Bankruptcy Court's ruling. Relying upon the Supreme Court's decision in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), it considered the Project's fair market value controlling and found the appraisal to have accurately measured that value. The District Court rejected the Cornerstone Investors' suggestion that the plan budget constituted the appropriate basis for valuing their secured claims because they knew that the amount of their secured claims would be determined pursuant to the Committee's motion, as the plan specifically so stated. The plan budget, the District Court stated, merely constituted projections meant to demonstrate the plan's

9

feasibility, not the Project's present value. The District Court noted that, while the Supreme Court has prohibited lien stripping in liquidation cases, *see Dewsnup v. Timm*, 502 U.S. 410 (1992), nothing prohibited lien stripping in the reorganization context.

This timely appeal followed. The Cornerstone Investors make two interrelated arguments, emphasizing throughout that § 506(a) requires that property be valued "in light of . . . [its] proposed disposition or use." First, the Cornerstone Investors contend that the Project's discounted present value, as reflected in the appraisal, cannot control the extent to which their claims are secured because the plan calls for Debtors to develop and sell homes in the subdivision over time. The Bankruptcy Court, the argument proceeds, could only have valued the Project in a manner respectful of its "proposed disposition or use" by awaiting the results of the planned build-out. Second, the Cornerstone Investors contend that, by pinning a value to the Project prior to the plan's completion in violation of § 506(a)'s dictates, the Bankruptcy Court denied them revenue that would ultimately be realized from the Project in excess of its appraisal value. They urge that depriving them of any increase in the worth of their collateral beyond its judicially determined value violates restrictions on lien stripping imposed by the Supreme Court in *Dewsnup*.

After briefly turning to the burden of proof, we address each aspect of the Cornerstone Investors' argument in turn.

II. Jurisdiction and Standard of Review

The Bankruptcy Court had jurisdiction over the instant dispute pursuant to 28 U.S.C. § 1334. The District Court had

10

jurisdiction to review the final order of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). We have jurisdiction pursuant to 28 U.S.C. § 158(d).

"Because the District Court sat as an appellate court, reviewing an order of the Bankruptcy Court, our review of the District Court's determinations is plenary." *In re Rashid*, 210 F.3d 201, 205 (3d Cir. 2000), *superseded on other grounds as stated in In re Warfel*, 268 B.R. 205, 212 n.7 (B.A.P. 9th Cir. 2001). In reviewing the Bankruptcy Court's determinations, we exercise the same standard of review as did the District Court. *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995). Accordingly, the Bankruptcy Court's findings of fact are reviewed only for clear error, while legal determinations are reviewed *de novo*. *In re Engel*, 124 F.3d 567, 571 (3d Cir. 1997).

III. Discussion

A. *Burden-Shifting Framework*

Neither the Code nor the Federal Rules of Bankruptcy Procedure allocates the burden of proof as to the value of secured claims under § 506(a). In the absence of explicit direction, courts have arrived at divergent formulations. Although neither the Bankruptcy Court nor the District Court considered this issue, addressing it informs our review of the question on appeal and provides guidance to courts generally. Accordingly, we requested supplemental briefing on the issue. We now hold that a burden-shifting framework controls valuations of collateral to decide the extent to which claims are secured pursuant to § 506(a).

11

Three approaches to the burden of proof in proceedings to value secured claims under § 506(a) have predominated in bankruptcy cases. Some courts have concluded that the secured creditor bears the burden of proof. *See, e.g.*, *In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D.N.Y. 2009). Other courts have held that the party challenging the value of a claim, usually the debtor, bears the burden of proof. *See, e.g.*, *In re Weichey*, 405 B.R. 158, 164 (Bankr. W.D. Pa. 2009). A third group of courts has settled on a burden-shifting analysis, pursuant to which "the debtor bears the initial burden of proof to overcome the presumed validity and amount of the creditor's secured claim," but "the ultimate burden of persuasion is upon the creditor to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim." *In re Robertson*, 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992).

"The circumstances will dictate the assignment of the burden of proof on the question of value." *In re Young*, 390 B.R. 480, 486 (Bankr. D. Me. 2008). Cognizant of this principle, a burden-shifting approach strikes us as most appropriate in the instant scenario. The initial burden should be on the party challenging a secured claim's value, because "11 U.S.C. § 502(a) and Bankruptcy Rule 3001(f) grant prima facie effect to the validity and amount of a properly filed claim." *In re Williams*, 381 B.R. 742, 744 (Bankr. W.D. Ark. 2008). It is only fair, then, that the party seeking to negate the presumptively valid amount of a secured claim — and thereby affect the rights of a creditor — bear the initial burden. *See In re Brown*, 244 B.R. 603, 609-10 (Bankr. W.D. Va. 2000). If the movant establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value, the burden

shifts.  The creditor thereafter bears "the ultimate burden of persuasion . . . to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim."[4]  *In re Robertson*, 135 B.R. at 352.

Before applying the burden-shifting framework to this dispute, we must first grapple with the two more fundamental challenges raised by the Cornerstone Investors: that use of the collateral's fair market value violated § 506(a)'s "proposed disposition or use" language; and, that the collateral's increase in value after the § 506(a) valuation rightly accrues to their benefit.  That is because, if either contention is correct, the appraisal would not have constituted a proper basis for the Bankruptcy Court's ruling.

B.  *Section 506(a) Valuation Standards*

Central to resolution of this matter is the text of § 506(a).  It provides in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's

---

[4]Allocating the ultimate burden of persuasion to the creditor whose proof of claim has been challenged is consistent with the rest of the Code.  "Throughout the Code, the burden of proving the 'validity, priority, and extent' of security interests lies upon the creditors asserting such interests."  *In re Buick*, 126 B.R. 840, 851 (Bankr. E.D. Pa. 1991).

13

interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . . .*

11 U.S.C. § 506(a) (emphasis added). The provision, therefore, calls for the division of secured creditors' claims into "secured and unsecured portions, with the secured portion[s] of the claim[s] limited to the value of the collateral." *Rash*, 520 U.S. at 961.

Though the statute requires that collateral be valued, it does not specify the appropriate valuation standard. *See In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 73-74 (1st Cir. 1995) ("The statute does not direct courts to choose any particular valuation standard in a given type of case."). According to a House Report on § 506(a), "'[v]alue' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it imply a full going concern value." *See* H.R. Rep. No. 95-595, at 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6312. Rather, Congress envisioned a flexible approach to valuation whereby bankruptcy courts would choose the standard that best fits the circumstances of a particular case. *Id.* ("Courts will have to determine the value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case."). Congress did make at least one thing clear, though: "the

14

'proposed disposition or use' of the collateral is of paramount importance to the valuation question." *Rash*, 520 U.S. at 962.

If that language is to be afforded any significance, then, the appropriate standard for valuing collateral must depend upon what is to be done with the property — whether it is to be liquidated, surrendered, or retained by the debtor. In *Rash*, the Supreme Court considered how to value collateral retained by a Chapter 13 debtor exercising the cram down option in § 1325(a)(5)(B) of the Code. The Court distinguished that option from the alternative available to the Chapter 13 debtor — in which its collateral would be surrendered to the objecting debtor — when deciding the proper valuation standard under § 506(a).[5] *See id.* at 962 ("The 'disposition or use' of the collateral thus turns on the alternative the debtor chooses . . . ."). When a debtor elects "to use the collateral to generate an income stream" as in a cram down, the Court noted, use of a foreclosure-value standard would be improper because "a foreclosure sale . . . will not take place." *Id.* at 963. By contrast, the replacement-value standard "values 'the creditor's interest in the collateral in light of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to . . . its [replacement] value.'" *Id.* (quoting *In re Winthrop Old Farm Nurseries*, 50 F.3d at 75)

---

[5]The Court considered three possible valuation standards: "(1) what the secured creditor could obtain through foreclosure sale of the property (the 'foreclosure-value' standard); (2) what the debtor would have to pay for comparable property (the 'replacement-value' standard); or (3) the mid-point between these two measurements." *Rash*, 520 U.S. at 955-56.

(alterations in original).  Accordingly, the Court held that "under § 506(a), the value of property retained . . . is the cost the debtor would incur to obtain a like asset for the same 'proposed use,'" i.e., its replacement value.[6]  *Id.*

Courts have recognized that similar reasoning applies with equal force in the Chapter 11 reorganization context. *See, e.g.*, *In re Mayslake Village-Plainfield Campus, Inc.*, 441 B.R. 309, 320 n.2 (Bankr. N.D. Ill. 2010) ("The same [replacement] value can be used in this matter, even though a Chapter 11 cram down plan is involved.").  Where a Chapter 11 plan of reorganization provides for a debtor to retain and use collateral to generate income with which to make payments to creditors, a § 506(a) valuation based upon a hypothetical foreclosure sale would not be appropriate, as it would be inconsistent with the provision's dictates.  "In ordinary circumstances the present value of the income stream would [instead] be equal to the collateral's fair market value." *In re Winthrop Old Farm Nurseries*, 50 F.3d at 75.  Indeed, the *Rash* Court considered its "use of the term replacement value . . . consistent with . . . the meaning of fair-market value" because both reflect "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." 520 U.S. at 959 n.2.  The proper measure under § 506(a) must

---

[6]The Supreme Court expressly left "to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented." *Rash*, 520 U.S. at 965 n.6.

16

therefore be the collateral's fair market value because it is most respectful of the property's anticipated use.[7]

By contrast, the Cornerstone Investors urge a market-based, or wait-and-see, approach to valuation of the Project. They argue that if the property, when sold, will bring in sufficient dollars to pay their secured claims in full, their claims should reflect that value. They suggest that, because Debtors will continue to develop and sell lots during the plan's life, the extent to which their claims are secured should similarly be calculated over time. To our knowledge, however, under no circumstances has such an approach been used, even when the collateral at issue was of a similar nature. *See, e.g.*, *In re Tamarack Trail Co.*, 23 B.R. 3, 5-6 (Bankr. S.D. Ohio 1982) (valuing a partially completed development project based on the fair market value in its current condition). Its absence is for good reason. A wait-and-see approach would in effect do away with bankruptcy courts' obligation to determine value under § 506(a).[8] That result is

_____

[7] Like the appropriate measure of fair market value, the appropriate time as of which to value collateral may differ depending on the facts presented. *See* King, 4 Collier on Bankruptcy ¶ 506.03[10] (15th ed. rev. 2009) (discussing the potentially relevant dates of valuation for purposes of § 506(a)). As with the replacement valuation technique, bankruptcy courts are best situated to determine when is the appropriate time to value collateral in the first instance. We, therefore, defer to their considered judgment.

[8] Federal Rule of Bankruptcy Procedure 3012 — pursuant to which the Committee made its motion — allows interested parties to request that a bankruptcy court value

17

at odds with the Bankruptcy Code. In § 506(a), Congress expressly provided for the division of allowed claims supported by liens into secured and unsecured portions during the reorganization, before the plan's success or failure is clear. The fact that its "proposed disposition or use" should be factored into the valuation does not mean that the time as of which property is valued is to be postponed or altered.

Both the Bankruptcy Court and the District Court accurately characterized the budget as simply a set of projections offered in support of the plan's feasibility, i.e., to demonstrate that the plan would have a "reasonable probability" of success. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The key element of feasibility is whether there is a reasonable probability the provisions of the plan can be performed."). It was not intended to function as anything more, and most certainly not as a determination of the value of the Cornerstone Investors' interest in the Project. This is clear from the fact that the plan expressly states that the amount of their secured claims will be determined by the Bankruptcy Court pursuant to the Committee's motion. More fundamentally, the projections regarding monies to be realized from the sale of lots over time do not equate to "value" as of confirmation because they anticipate Debtors spending time and money to realize value

_____

claims and therefore necessarily requires that collateral's worth be affixed in advance of a reorganization's completion. Parties like the Committee would have very little, if any, reason to make such motions for valuations pursuant to Rule 3012 if bankruptcy courts adopted the approach here urged by the Cornerstone Investors. This is further reason to reject it as discordant with bankruptcy practice.

18

at a later date. That future value should not be credited to the secured creditor at confirmation. A "probability" of realizing the budget is not a certainty of its realization. In sum, valuations must be based upon realistic measures of present worth.

Applying these precepts to the matter at hand, we hold that the Bankruptcy Court properly concluded that the fair market value of the Project as of the confirmation date controls whether the Cornerstone Investors' claims are secured or not. That is because the confirmed plan of reorganization called for Debtors to retain ownership of the real estate subdivision in order to complete its development. The discounted fair market value of the property as of the confirmation date, therefore, best approximated just how secure the liens held by creditors — namely, the Bank Lenders and Cornerstone Investors — were at the relevant point in Debtors' bankruptcy.[9] Because, as the Cornerstone

---

[9] "[T]he value of the property should be determined as of the date to which the valuation relates." *In re Savannah Gardens-Oaktree*, 146 B.R. 306, 308 (Bankr. S.D. Ga. 1992). "Where, as here, the purpose of the valuation is to determine the treatment of a claim by a plan, the values determined at the § 506(a) hearing must be compatible with the values that will prevail on the confirmation date . . . ." *In re Stanley*, 185 B.R. 417, 423-24 (Bankr. D. Conn. 1995). We, therefore, agree with the Bankruptcy Court's determination that the appropriate time at which to assess the Project's fair market value in deciding the Committee's motion was on, or close to, the plan's confirmation date. *See, e.g.*, *In re Melgar Enters., Inc.*, 151 B.R. 34, 39 (Bankr. E.D.N.Y. 1993) (finding that a real estate project should be valued in its present state and "in

Investors stipulated, the appraisal accurately calculated the Project's fair market value, the Bankruptcy Court correctly concluded that claims of the Cornerstone Investors were wholly unsecured.

C. *Lien Stripping in Chapter 11 Reorganizations*

The Cornerstone Investors argue that denying them future lot sale proceeds that exceed the Project's judicially determined value as of confirmation constitutes a form of lien stripping disallowed by the Supreme Court's decision in *Dewsnup*. For the reasons set forth below, however, we reject this argument.

In *Dewsnup*, the Supreme Court considered "some ambiguities" in § 506 and its relationship to other provisions of the Bankruptcy Code when a Chapter 7 debtor's property increases in value between the time of its judicial valuation and the time of its foreclosure sale. 502 U.S. at 416. Guided by the principle that liens are to pass through bankruptcy unaffected, the Court rejected the notion that a mortgagee could be forced to accept the judicially determined value, even if the foreclosure sale produced more:

> The practical effect of petitioner's argument is to freeze the creditor's secured interest at the judicially determined valuation. By this approach, the creditor would lose the benefit of any increase in the value of the

close proximity to the effective date of the plan"). No party has argued otherwise.

20

> property by the time of the
> foreclosure sale. The increase
> would accrue to the benefit of the
> debtor, a result some of the parties
> describe as a "windfall."
>
> We think, however, that the
> creditor's lien stays with the real
> property until the foreclosure.
> That is what was bargained for by
> the mortgagor and the mortgagee.

*Id.* at 417. Expressly limiting its focus to the specific facts presented, the Court held that "[a]ny increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor." *Id.* at 416-17.

*Dewsnup* involved a Chapter 7 liquidation proceeding and the Supreme Court did not address whether the same result would be reached in Chapter 11 reorganization cases. *See id.* "A great majority of courts that have considered the issue . . . have concluded that the holding in *Dewsnup* should be limited to Chapter 7 cases . . . ." *In re Johnson*, 386 B.R. 171, 175 (Bankr. W.D. Pa. 2008). That is because "[t]he rationales advanced in the *Dewsnup* opinion for prohibiting lien stripping . . . have little relevance in the context of rehabilitative bankruptcy proceedings under Chapter[] 11." *In re Bartee*, 212 F.3d 277, 291 n.21 (5th Cir. 2000) (internal quotation marks and citation omitted). Particularly significant is the fact that, as hinted by the *Dewsnup* Court itself, "pre-Code law did provide for the modification of liens in reorganization cases." *Harmon v. United States*, 101 F.3d 574, 582 n.4 (8th Cir. 1996). "Congress must have enacted the Code with a full understanding of this practice."

*Dewsnup*, 502 U.S. at 419. The distinction makes sense: Chapter 7 liquidation proceedings involve the sale of liened property; Chapter 11 reorganizations involve the retention and use of that property in the rehabilitated debtor's business. The Code makes that clear: "the process of lien stripping is ingrained in the reorganization provisions of the Bankruptcy Code to such an extent that any attempt to extend the holding in *Dewsnup* to Chapter 11 cases would require that numerous provisions of the statute be ignored or construed in a very convoluted manner."[10] *Johnson*, 386 B.R. at 176; *see also In re Dever*, 164 B.R. 132, 133 (Bankr. C.D. Cal. 1994). Indeed, Congress's post-*Dewsnup* addition of 11 U.S.C. § 1123(b)(5) — permitting modification of the rights of holders of secured claims, except those secured solely by a debtor's

---

[10]Two provisions in Chapter 11 demonstrate the complications inherent in the Cornerstone Investors' invocation of *Dewsnup*. The first is § 1129(b), pursuant to which a Chapter 11 plan must provide for the retention of liens only up to the value of the secured creditor's collateral in order to satisfy the requirements of a cram down. *See In re 680 Fifth Ave. Assocs.*, 156 B.R. 726, 731 n.7 (Bankr. S.D.N.Y. 1993). That the lien a plan must preserve need only collateralize a "secured claim," as defined in § 506(a), is indicative of Chapter 11 debtors' ability to strip liens down to the collateral's value. *Id.* The second is § 1111(b), pursuant to which undersecured creditors may opt out of the lien stripping found in § 1129 and instead be treated as fully secured to the extent of their allowed claims. That undersecured creditors have that option similarly suggests that Chapter 11 debtors possess the authority to limit secured claims to the value of the collateral. *See Wade v. Bradford*, 39 F.3d 1126, 1129 (10th Cir. 1994).

principal residence — seems to constitute explicit approval of lien stripping in Chapter 11 bankruptcies. *Johnson*, 386 B.R. at 176-77.

We therefore agree with the majority of courts that *Dewsnup*'s holding should not be imported into Chapter 11 cases. That this particular plan of reorganization provides for Debtors to develop and sell all of the lots does not alter our conclusion, because that is Debtors' business. As appealing as it might be to apply the *Dewsnup* Court's holding to the "sale" context here, it simply does not fit. Debtors' collateral is not being sold in a Chapter 7 liquidation. There is neither foreclosure nor loss of opportunity to "credit bid," which seem to have animated the Court's reasoning in *Dewsnup*. Unlike Chapter 7 liquidations, Chapter 11 reorganizations call for the creditor to receive payments equal to the value of its interest in the collateral over time. *See In re Bowen*, 174 B.R. 840, 855 (Bankr. S.D. Ga. 1994) ("Unlike the creditor in *Dewsnup*, creditors in reorganization cases receive something in exchange for the voiding of their liens: payment obligations under a plan of reorganization."). Thus, we find no impermissible stripping of the Cornerstone Investors' liens.

Accordingly, the Bankruptcy Court correctly found that the fair market value of the Project was less than the secured claim of the Bank Lenders, and did not violate *Dewsnup*, or any other principle of bankruptcy law, by adjudging the Cornerstone Investors' claims wholly unsecured.

D. *Burden of Proving the Project's Value*

23

Having now disposed of the Cornerstone Investors' principal arguments for why the Project's fair market value as of confirmation cannot control here, we return to the burden of proof. To reiterate, when a party moves for a bankruptcy court to value secured claims pursuant to § 506(a), a burden-shifting framework will govern. Application of the framework here demonstrates that the Cornerstone Investors' appeal must fail.

The Committee filed the motion seeking to have the Cornerstone Investors' claims deemed wholly unsecured, and it was therefore obligated to present evidence that the Project's fair market value, together with the value of other collateral held by Debtors, was less than the Bank Lenders' secured claim. Its submission of an appraisal previously accepted as evidence of the Project's value at a cash collateral hearing, as adjusted, satisfied the Committee's burden. The veteran appraiser it enlisted used well-accepted techniques of real estate appraisal to calculate the Project's fair market value. That the appraiser did so in light of the property's "proposed disposition or use" is clear from its acceptance of results derived from the "Developer's Approach," an income capitalization "method of estimating land value when subdivision and development are the highest and best use of the parcel of land being appraised." Dictionary of Real Estate Appraisal (4th ed.) 279-80. That approach most "accurately considered the time and expenses" that would be incurred by the Debtors in developing the property. The Bankruptcy Court, therefore, did not err by accepting the appraiser's calculation of the Project's fair market value, namely, $9,543,396.23 after adjustment.

On appeal, the Cornerstone Investors attempt to chip away at the appraisal, contending that the appraiser's

24

methodology was flawed in certain respects. However, the Cornerstone Investors leveled no such challenges before the Bankruptcy Court. At the hearing on the Committee's motion, they conceded that the appraisal accurately calculated the Project's fair market value and urged only that the fair market value should not control. Even assuming, however, that their failure to challenge the accuracy of the appraisal's fair market value determination did not waive the contention on appeal, the Cornerstone Investors' arguments still fail to demonstrate any error by the Bankruptcy Court.

The purported missteps by the appraiser to which they point do not undermine the appraisal's suitability to satisfy the Committee's initial burden. First, the Cornerstone Investors suggest that the appraiser improperly applied discounts "to attract a buyer" because the plan did not contemplate sale to a single developer. Those discounts, however, merely accounted for the risks and uncertainty inherent in the build-out in which Debtors were engaged. In other words, they were necessary to establish the Project's *present* fair market value. Second, the Cornerstone Investors urge that the appraisal was too stale to be acceptable, having been completed over a year before the plan's confirmation. However, through stipulations of fact presented to the Bankruptcy Court, the fair market value of the Project was reduced to account for sales of homes that occurred between the date of appraisal and the date of confirmation. Although the adjustment did not account for potential shifts in land value or the residential home market that may have occurred during that period, the Cornerstone Investors offered no evidence of any such changes. The Bankruptcy Court, therefore, did not err by adopting the adjusted appraisal value

of $9,543,396.23 as a fair reflection of the Project's worth as of the date on which the plan was confirmed.

Under a burden-shifting framework, the Cornerstone Investors had the ultimate burden of persuading the Bankruptcy Court that the appraisal undervalued the Project and that the Project was instead worth enough to secure their claims under § 506(a). At the hearing on the Committee's motion, the Cornerstone Investors, however, expressly declined to have "an appraiser . . . come in and say that either [the Committee's] appraisal was wrong or that we had a higher . . . fair market value." Instead, they relied upon the plan budget as providing the proper valuation. The Bankruptcy Court and District Court properly held that the budget was not a valuation, but, rather, a projection and refused the Cornerstone Investors' invitation to use a wait-and-see approach. The Cornerstone Investors thus failed to satisfy their burden.

Thus, the Bankruptcy Court properly accepted the valuation put forth by the Committee because it satisfied the Committee's burden of overcoming the presumed validity and amount of the Cornerstone Investors' secured claims. The Cornerstone Investors, by contrast, did not satisfy their burden of proving that their secured claims were worth more than the Committee's valuation indicated. Accordingly, the Bankruptcy Court did not clearly err by concluding that, in total, the collateral securing the secured debt was worth $11,165,477.15 and that therefore the Cornerstone Investors' claims were unsecured.

IV. Conclusion

For the foregoing reasons, we will affirm the Bankruptcy Court's determination that the secured claims of the Cornerstone Investors should be valued at zero. Pursuant to Debtors' plan of reorganization, then, they are to be treated as members of Class 5, unsecured claimants.