In the Matter of Dan L. DUNSON and Nancy M. Dunson, Danny Dunson and Andrea Dunson, David M. Dunson, and EMD, LLC., Debtors.

Dan L. Dunson and Nancy M Dunson, Danny Dunson and Andrea Dunson, David M. Dunson, and EMD, LLC., Movants.

v.

Regions Bank d/b/a Regions Mortgage and PNC Bank, N.A., Respondents.

Nos. 13–10604–WHD, 13–10605–WHD, 13–10606–WHD, 13–10607–WHD.

United States Bankruptcy Court, N.D. Georgia, Newnan Division.

Signed July 16, 2014.

David L. Bury, Jr., Matthew Stewart Cathey, Ward Stone, Jr., Stone & Baxter, LLP, Macon, GA, for Debtors.

R. Jeneane Treace, Office of the United States Trustee, Atlanta, GA.

## ORDER

W. HOMER DRAKE, Bankruptcy Judge.

Before the Court is the Motion to Value the Collateral of Regions Bank d/b/a Regions Mortgage (hereinafter "Regions") and PNC Bank (hereinafter "PNC"), filed by Dan L. Dunson, Nancy Dunson, Danny L. Dunson, Jr., Andrea L. Dunson, and David M. Dunson (hereinafter collectively referred to as the "Debtors"). Pursuant to section 506(a) of the Bankruptcy Code and Rule 3012 of the Federal Rules of Bankruptcy Procedure, the Debtors ask the Court to determine the value of the secured claims of Regions and PNC. To do so, the Court must determine the value of the interests held by Regions and PNC in the bankruptcy estates' interests in the various pieces of real property (hereinafter the "Collateral") that serve as collateral for the claims of Regions and PNC. This matter is a core proceeding, over which subject matter jurisdiction and venue· are proper. *See* 28 U.S.C. §§ 157; 1334; 1408;1409.

## Procedural History

The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on March 6, 2013. The Court has since approved the disclosure statement for the Debtors' First Amended Joint Plan of Reorganization (hereinafter the "Plan"), and the hearing on confirmation of the Plan is set for July 30, 2014. The parties acknowledge that, although it is likely that both PNC and Regions will elect under section 1111(b)(2) to have their claims treated as fully secured for purposes of the Plan, the value of the Collateral will, nonetheless, be relevant to the Court's determination of whether the Plan is confirmable.

For this reason, the Debtors, at the request of Regions and PNC, filed the instant motion. The Court held an evidentiary hearing on June 5, 2014. The Debtors presented the expert testimony of appraiser Ken Fletcher and the testimony of Dan Dunson, one of the owners and managers of the Collateral, and Regions and PNC presented the expert testimony of appraiser Twila Gardner.

The parties primarily disagree over the appropriate valuation method to be used to value the Collateral. Mr. Fletcher testified that the best valuation method for valuing the Collateral is an income-based approach because the Collateral is located in areas predominated by rental housing, rather than owner-occupied residential property. According to Mr. Fletcher, the most likely purchaser for the Collateral would be an investor who would value the properties based solely on their rental income without regard to the various differences in the condition of the properties. Ms. Gardner, however, testified that the most appropriate valuation method is the sales comparison approach because it is the best indicator of what comparable properties have sold for and does not rely on an assumption that only investors will purchase the properties.

Aside from disagreeing with Mr. Fletcher's valuation method, Regions and PNC object to Mr. Fletcher's opinion because: (1) his appraisals for certain properties were conducted in January 2013 and rely on "stale" comparable sales; (2) he did not physically inspect the interiors of all of the properties; and (3) he applied a 10% "bulk" sales discount to certain properties to account for the fact that an investor would purchase several such properties in one transaction and would demand a discount. Likewise, the Debtors question the accuracy of Ms. Gardner's opinion because it relied more heavily on sales of properties that were not the most comparable sales available and, in one case, occurred in neighborhoods that have more owner-occupied homes than the subject neighborhoods. Following the hearing, the Court took the matter under advisement.

## Findings of Fact

1. The Debtors collectively operate a residential real estate management company known as "Dunson Properties" in Griffin, Georgia.

2. Combined, the Debtors own approximately one hundred and eighty mostly single-family residential properties, including the Collateral.

3. The majority of the properties that comprise the Collateral are located in the Waterford Subdivision in Griffin, Georgia (hereinafter the "Waterford Properties"), with the remaining properties located in other neighborhoods in downtown Griffin, Georgia (hereinafter the "Non–Waterford Properties").

4. The Debtors intend to retain and continue using the Collateral as single-family residential rental property.

5. The Waterford Subdivision contains primarily investor-owned, low-income

residential rental property. Approximately 75% of the homes in the Waterford Subdivision are used as rental property.

6. The Non–Waterford Properties are also located in low-income residential areas of Griffin that contain primarily rental properties.

### Conclusions of Law

Section 506(a)(1) of the Bankruptcy Code provides in relevant part

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.*

11 U.S.C. § 506(a)(1) (emphasis added). Under Rule 3012 of the Federal Rules of Bankruptcy Procedure, "the court may determine the value of a claim secured by a lien on property in which the estate has an interest." FED. R. BANKR.P. 3012.

Neither the Code nor the Federal Rules of Bankruptcy Procedure assign the burden of proof for a motion to determine the value of a creditor's interest in its collateral. Rather, "[t]he circumstances will dictate the assignment of the burden of proof on the question of value." *In re Young,* 390 B.R. 480, 486 (Bankr.D.Me.2008).

■ Courts disagree as to the proper placement of the burden of proof when the creditor's interest in property is being valued to determine whether a plan is con-

firmable. *Compare In re Horner,* No. 11–41012–MGD, 2011 WL 5152290, at *2 (Bankr.N.D.Ga. July 18, 2011) (Diehl, J.) (placing the burden on the debtor of establishing the value of collateral for purposes of determining whether the plan's treatment of the secured creditor's claim meets the requirements of section 1325(a)(5)(B)(ii)), *In re Tucker,* No. 12–53285–JDW, 2013 WL 3230615, at *3 (Bankr.M.D.Ga. June 25, 2013) (same), *Young,* 390 B.R. at 486–87 (same), *and In re Johnston,* Adv. No. 12–05066, 2013 WL 1844751, at *6 (Bankr.W.D.Va. Apr. 12, 2013) (placing the burden of proof under section 506(a) on the debtor because the debtor is the party seeking the relief—a finding that the proposed treatment of the creditor under a plan will satisfy the confirmation requirements of the Bankruptcy Code), *with In re Heritage Highgate, Inc.,* 679 F.3d 132, 140 (3d Cir.2012) (applying a burden-shifting analysis that places the initial burden on the debtor to establish that the creditor's "proof of claim overvalues a creditor's secured claim," with the ultimate burden on the creditor to prove the " 'extent of its lien and the value of the collateral securing its claim' ") *and In re Rozinski,* 487 B.R. 549, 554 (Bankr.D.Colo. 2013) (same). Having considered the various approaches to determining which party has the burden of proof, the Court will place the burden of proof on the Debtors in this case.

■ Unless the bankruptcy estate does not own 100% of the collateral, the "value of such creditor's interest in the estate's interest in such property" is equivalent to the value of the collateral. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (citing H.R.Rep. No. 95–595, pp. 181, 356 (1977); S.Rep. No. 95–989, p. 68 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787,

5854, 6141, 6312). This value must be determined "in light of the purpose of the valuation and of the proposed disposition or use of such property." *See* 11 U.S.C. § 506(a). Indeed, whether the debtor intends to liquidate, surrender, or retain the collateral is " 'of paramount importance to the valuation question.' " *Heritage Highgate,* 679 F.3d 132, 141 (3d Cir.2012) (quoting *Assocs. Commercial Corp. v. Rash,* 520 U.S. 953, 962, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997)); *see also Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Savs. (In re Winthrop Old Farm Nurseries, Inc.),* 50 F.3d 72, 75 (1st Cir.1995). As to the time of the determination, when the valuation's purpose is to determine whether the plan's treatment of the secured claim satisfies the Code's confirmation requirements, the Court values collateral as of the confirmation date. *See In re Atlanta S. Bus. Park, Ltd.,* 173 B.R. 444, 450 (Bankr.N.D.Ga.1994) (Drake, J.).

■ Here, the proposed use or disposition of the Collateral under the Plan is the Debtors' retention of the Collateral to generate income. Accordingly, the proper measure of value in accordance with section 506(a) is the fair market value, which should be determined by reference to the debtor's cost to replace the property for the same proposed use, rather than the value the creditor would receive by selling the property. *See Rash,* 520 U.S. at 960, 117 S.Ct. 1879 (replacement cost is "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller"); *see also Heritage Highgate,* 679 F.3d at 141; 4 COLLIERS ON BANKRUPTCY, ¶ 506.03[6][c][iii], ¶ 506.03[7][d] (stating that the United States Supreme Court's decision in *Rash* clarified that a valuation can use either a hypothetical purchase standard (replacement value) or a hypothetical sale (by the creditor), but not a combination of the two

and that replacement cost is the proper valuation standard when the debtor intends to retain the collateral). When determining the replacement value, the Court must consider the particular facts of the case, including the condition, age, and location of the property, as well as the attributes and business practices of the hypothetical seller. 4 COLLIERS ON BANKRUPTCY, ¶ 506.03[6][c][iv]. Whether the Court relies upon a replacement value that is more in the nature of a retail value or a wholesale value will also depend upon the "type of debtor and the nature of the property." *Rash,* 520 U.S. at 965 n. 6, 117 S.Ct. 1879.

■ Applying all of the foregoing principles, the Court finds that Mr. Fletcher's opinion as to the fair market values of the Waterford Properties is the most credible of the two expert opinions offered. First, the Court finds that Mr. Fletcher is more knowledgeable regarding the Griffin residential rental property market in general and, more importantly, has more familiarity with and a better understanding of the unique nature of the Waterford Subdivision than Ms. Gardner. He also appears to have more experience appraising income-producing residential real property.

Second, Mr. Fletcher performed his valuation using a generally accepted method of valuing income-producing residential real property that is a better measure of fair market value in this case than the sales comparison approach. As noted above, the valuation must be made in light of the Debtors' proposed use or disposition of the property, which is the retention and continued use of the properties as rental property. Therefore, a valuation method that considers what an investor in residential rental property, such as the Debtors, would pay a seller to acquire such properties, rather than what a retail buyer would pay, is a more appropriate

method to obtain a replacement value. In reaching this conclusion, the Court acknowledges that an investor looking to purchase rental properties will still have to compete with buyers looking to use these properties for other purposes. But given the undisputed testimony regarding the nature of the neighborhoods in which the Collateral is located and the fact that there is virtually no market for selling homes in these neighborhoods to non-investor buyers, valuing the Collateral based on their expected rental income should give a more accurate value than the sales comparison approach.

PNC and Regions question Mr. Fletcher's appraisals because he did not inspect the interiors of all of the properties and did not make adjustments to their values for differences in condition and amenities. Ordinarily, the Court would agree with PNC and Regions that there should be a correlation between a property's square footage, condition, and amenities and the rent that can be obtained for such a property. But the Court is not concerned in this case that Mr. Fletcher did not consider the differing attributes of the properties. Mr. Fletcher testified that inspecting each property was not necessary in this case, given the similarities between all of the properties and the fact that minor differences in the properties, such as the existence of a garage, did not have a discernible impact on the rents received. He relied on the actual rents being received for the properties, in the same manner a seller and a buyer would in determining the sale price for these particular units, and the Court finds that this method was reasonable under the circumstances of this case.

Additionally, the Court agrees with the Debtors that Mr. Fletcher's comparable

sales were more comparable than those relied upon by Ms. Gardner. As to the Waterford Properties, all of Mr. Fletcher's sales were recent and were located within Waterford Subdivision. In choosing his comparable sales for the Waterford Properties, Mr. Fletcher appropriately declined to rely on the sale of 144 Crystal Brook. After inquiring with the real estate broker who handled the sale, Mr. Fletcher determined that this sale was an anomaly that was not representative of the majority of sales in the neighborhood because the buyers were from out of state and purchased the property sight unseen. Mr. Fletcher's decision to do so was reasonable, given the significant difference between the sale price of 144 Crystal Brook and the remainder of the recent Waterford Subdivision sales, including the home right next door.[1] In contrast, Ms. Gardner not only relied on the sale of 144 Crystal Brook, but weighted it more heavily than the other sales within Waterford Subdivision. Likewise, the Court finds Ms. Gardner's opinion less persuasive than Mr. Fletcher's because she relied on and weighted more heavily the sale of 122 Pecan Drive. Although 122 Pecan Drive is not far from Waterford Subdivision, it is outside Waterford Subdivision. Based on Mr. Fletcher's testimony regarding the differences between Waterford Subdivision and the subdivision in which 122 Pecan Drive is located, the Court finds that 122 Pecan Drive is not as comparable as the Waterford Subdivision sales relied upon by Mr. Fletcher.

As to the Non–Waterford Properties, PNC and Regions assert that Mr. Fletcher's appraisals are not reliable because they were conducted in January 2013 and relied on comparable sales that are "stale." Having considered the comparable sales chosen and the testimony of Mr. Fletcher

---

1. It was also fair, given the fact that he offset the impact of excluding 144 Crystal Brook by also excluding the lowest of the seven recent sales in Waterford Subdivision.

regarding his decision not to update the Non–Waterford Property appraisals, the Court finds that the appraisals are the better indicator of the value of the Non–Waterford Properties. Mr. Fletcher testified that he chose not to update his appraisal because his research indicated that there was no new activity in the Non–Waterford neighborhoods and that rents had not increased. The Court credits Mr. Fletcher's professional judgment as to this decision and his knowledge of the local rental property market in concluding that his valuations of the Non–Waterford Properties are more persuasive than Ms. Gardner's sales comparison valuations.

■ For all of these reasons, the Court will accept the values placed by Mr. Fletcher on the Collateral. However, the Court declines to further reduce the values of the Waterford Properties by applying a 10% "bulk" sale discount. Mr. Fletcher testified that the value of the Waterford Properties must be adjusted to account for the fact that the Debtors own so many properties in the Waterford Subdivision and placing all of the properties on the market at one time would depress the selling price for each property. The valuation standard the Court applies here, however, does not assume that the Debtors would flood the market with all of their Waterford Properties at one time. Rather, it asks what a hypothetical debtor in similar (but not identical) circumstances would pay to buy a property similar in nature to the subject property. As the Supreme Court explained in *Rash*, this standard "accurately gauges the debtor's 'use' of the property" by valuing the " 'the creditor's interest in the collateral in light of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to ... its [replacement] value.' " *Rash*, 520 U.S. at 963, 117 S.Ct. 1879 (quoting *Winthrop Old Farm Nurseries*, 50 F.3d at 75).

The Court recognizes that Mr. Fletcher also testified that a buyer in the Debtors' business (an investor) would purchase the Waterford Properties as part of a "bulk" sale (meaning between five and ten properties at a time) and would demand a discount for doing so. Nonetheless, under the replacement value standard applied here, there is no basis to assume that a hypothetical buyer in the same business as the Debtors, when replacing one piece of investment property, would necessarily buy in bulk. Testimony in this case supports the conclusion that approximately 25% of the homes in the Waterford Subdivision and many other similar homes in surrounding subdivisions are owner-occupied and would be available for purchase by an investor, such as the Debtors, looking to replace a single piece of investment property. Accordingly, the Court is not required to assume that any transaction to replace one of the Waterford Properties would be a bulk transaction, and the Court finds that doing so does not accurately account for the "economic benefit" that the Debtors will derive from retaining the Collateral and using it to generate income to fund the Plan.

### Conclusion

Having considered the testimony, documentary evidence, and arguments of counsel, the Court hereby disposes of the Motion to Value Collateral by designating a value for each of the properties comprising the Collateral, as indicated on the attached Exhibit 1.

**IT IS ORDERED.**

*Exhibit 1*
*Waterford Properties*

| | |
|---|---|
| 112 Crystal Brook | $27,950 |
| 112 Crystal Brook | $27,950 |

| | |
|---|---|
| 119 Crystal Brook | $27,950 |
| 120 Crystal Brook | $36,550 |
| 124 Crystal Brook | $29,885 |
| 130 Crystal Brook | $27,950 |
| 131 Crystal Brook | $25,585 |
| 134 Crystal Brook | $23,650 |
| 137 Crystal Brook | $27,950 |
| 143 Crystal Brook | $29,885 |
| 150 Crystal Brook | $31,949 |
| 152 Crystal Brook | $31,949 |
| 153 Crystal Brook | $27,950 |
| 154 Crystal Brook | $31,949 |
| 155 Crystal Brook | $31,175 |
| 159 Crystal Brook | $26,875 |
| 162 Crystal Brook | $29,885 |
| 166 Crystal Brook | $27,950 |
| 106 Pier Point | $29,885 |
| 108 Tuscany Lane | $29,885 |
| 110 Tuscany Lane | $30,100 |
| 112 Tuscany Lane | $29,885 |
| 113 Tuscany Lane | $27,950 |
| 117 Tuscany Lane | $29,885 |
| 118 Tuscany Lane | $27,950 |
| 119 Tuscany Lane | $27,864 |
| 121 Tuscany Lane | $32,250 |
| 122 Tuscany Lane | $29,885 |
| 123 Tuscany Lane | $29,885 |
| 126 Tuscany Lane | $29,885 |
| 129 Tuscany Lane | $29,885 |
| 130 Tuscany Lane | $29,885 |
| 114 Waterford Way | $31,175 |
| 142 Waterford Way | $29,885 |
| 109 Wedgewood Walk | $27,950 |
| 110 Wedgewood Walk | $29,885 |
| 114 Wedgewood Walk | $33,970 |
| 117 Wedgewood Walk | $27,950 |
| 119 Wedgewood Walk | $29,885 |
| 122 Wedgewood Walk | $21,500 |
| | |
| 118 Crystal Brook | $29,885 |
| 126 Crystal Brook | $27,950 |

| | |
|---|---|
| 156 Crystal Brook | $29,885 |
| 105 Shandon Lane | $29,885 |
| 128 Tuscany Lane | $29,885 |
| 107 Wedgewood Walk | $31,949 |

*Non–Waterford Properties*

| | |
|---|---|
| 58 Dundee Lake Circle | $25,000 |
| | |
| 717 Lane Street | $20,000 |
| 721 Lane Street | $20,000 |
| 725 Lane Street | $20,000 |
| 729 Lane Street | $20,000 |
| 819 Lane Street | $20,000 |
| | |
| 816 Lane Street | $20,000 |
| 832 Lane Street | $15,000 |
| 836 Lane Street | $15,000 |
| | |
| 106 Quincy Avenue | $20,000 |
| | |
| 129 Realty Street | $20,000 |
| 133 Realty Street | $20,000 |
| 137 Realty Street | $20,000 |
| 104 Quincy Avenue | $20,000 |
| | |
| 802 N. Ninth Street | $20,000 |
| 806 N. Ninth Street | $20,000 |
| 814 N. Ninth Street | $19,500 |
| 1340 N. Ninth Street | $22,000 |
| 420–422 South Sixth Street | $90,000 |